Brian E. BATEMAN; Charles H. Fricker, Plaintiffs–Counter–Defendants, Appellees–Cross–Appellants,

v.

MNEMONICS, INC.; Harry Thompson, President; David Katz, Vice President; Parking Automation Corporation; Joe Guidage, President, et al., Defendants–Counter–Claimants, Third–party–Plaintiffs, Appellants–Cross–Appellees,

City of Miami, an entity organized and existing under the laws of the State of Florida; Department of Off–Street Parking of the City of Miami, an agency and instrumentality of the City of Miami, Florida; Generex Corporation, a Florida Corporation, Third–party–Defendants.

No. 93–3234.

United States Court of Appeals, Eleventh Circuit.

March 22, 1996.

Rehearing Denied May 30, 1996.

Michael Kahn, Michael Kahn, P.A. Melbourne, Florida, Lawrence K. Nodine, Needle & Rosenberg, Atlanta, GA, for appellants.

Peter M.C. Choy, Mountain View, CA, for American Committee for Interoperable Systems.

Herbert L. Allen, Allen, Dyer, Doppelt, Franjola & Milbrath, Orlando, FL, for appellees.

ON PETITION FOR REHEARING

Before BIRCH and DUBINA, Circuit Judges, and JOHNSON, Senior Circuit Judge.

BIRCH, Circuit Judge:

Pursuant to Federal Rule of Appellate Procedure 40(a), the panel hereby grants the appellees' petition for rehearing, withdraws the previous panel opinion dated December 22, 1995, and substitutes the following opinion:

This appeal requires us to address two issues of first impression in this circuit: (1) what methodology is to be employed in analyzing claims of copyright infringement of computer software, and (2) whether interface specifications are entitled to copyright protection. For the reasons that follow, we VACATE the judgment of the district court on the two copyright infringement counts and REMAND for a new trial on these counts. In addition, we REVERSE the judgment of the district court on the trade secret misappropriation count and instruct the district court to enter judgment as a matter of law for the appellants on this count.

## I. BACKGROUND

Appellees-cross-appellants Brian E. Bateman and Charles H. Fricker filed an action in federal court against appellants-cross-appellees Mnemonics, Inc., Harry Thompson, David Katz, Parking Automation Corp., BCS, Inc. ("BCS"), and Robert Brunet (collectively "PAC"). The second amended complaint alleged copyright infringement in Bateman's single board computer operating system ("SBCOS") software (Count I), copyright infringement in Bateman and Fricker's hardware logic diagrams for their computer circuit board (Count II), copyright infringement in the programmable array logic ("PAL") software (Count III), false designation of ori-

gin in violation of 15 U.S.C. § 1125(a) (Count IV), common law unfair competition (Count V), and theft of trade secrets (Count VI).[1] After a lengthy trial, the jury found for Bateman and Fricker on three counts, awarding them $105,000 on Count I, $120,000 on Count II, and $300,000 on Count VI.[2] PAC appeals these judgments, and Bateman and Fricker cross-appeal, asserting that the district court abused its discretion in refusing to award exemplary damages to them on the trade secret claim under Fla.Stat. § 688.004(2).

Before addressing the many issues involved in this appeal, it is important to set forth the factual and technical background to this complex case. Both Bateman and Fricker are engineers. Bateman created and developed SBCOS software, and the Register of Copyrights registered his claim of copyright in this software.[3] Bateman and Fricker together created and developed hardware logic diagrams for a single board computer ("SBC") used in automated parking systems, and the Register of Copyrights registered their claim of copyright in these hardware logic diagrams.[4]

Initially, Bateman had a business relationship with BCS and its principal, Robert Brunet,[5] in the mid–1980s. BCS manufactured and sold computer boards to several companies, including Generex Corporation.[6]

1. Prior to trial, Bateman and Fricker consented to a dismissal of Count III after the United States Register of Copyrights refused registration of the PAL listings on the ground that PAL listings are not copyrightable subject matter. Bateman and Fricker continued to include the PAL listings as part of the trade secret claim of Count VI.

2. As for Counts IV and V of the second amended complaint, PAC conceded at trial that Bateman and Fricker were entitled to an injunction on these counts, and the district court's permanent injunction, dated September 20, 1993, precludes PAC from altering the copyright notice on or computer software listings in Bateman's original SBCOS. No appeal was taken on these counts.

3. The copyright registration number for Bateman's SBCOS software is TX 2–807–731, with an effective date of registration of March 29, 1990. The 1990 registration is derivative of Bateman's 1988 registration for an earlier version of his SBCOS software. The copyright registration issued in 1988 is numbered TXU 329–938. Bateman's SBCOS software is not limited in use to

parking systems (the use involved in this case), but also has several other functional uses, including cash drawer management and energy management. It was designed by Bateman as a general purpose operating system.

4. The copyright registration number in the hardware logic diagrams is VA 410–209, with an effective date of March 29, 1990.

5. Although we refer to Brunet and BCS separately at times, it is important to note that BCS was a very small company that was wholly controlled by Brunet. Therefore, the dealings of Generex, Bateman, and Fricker, although ostensibly with BCS, were effectively with Brunet, as the trial testimony reflects that Brunet and BCS were essentially one.

6. PAC acquired Generex's assets in 1987 and currently engages in the business of computerizing parking decks. Mnemonics, Inc. is the parent corporation of PAC and appellants-cross-ap-

Generex was engaged in the parking system business and desired to purchase a computer board and operating system for use in its parking garage business. To satisfy this need, Bateman and Fricker helped Brunet design a SBC, which contained Bateman's SBCOS software as one of its components.[7] Once the SBC was fully developed, BCS sold a number of these boards to Generex.[8] After this purchase, Generex's programmers composed an application program designed to interoperate with the SBCOS.[9] To ensure compatibility, Generex's programmers relied on specifications delivered to them by BCS [10] that dictated the "system calls" necessary to communicate with the operating system, the SBCOS.[11]

In 1987, Generex was acquired by PAC, a wholly owned subsidiary of Mnemonics, Inc. Pursuant to the BCS/Generex agreement, BCS began delivering SBCs to PAC. In the spring of 1988, Bateman terminated BCS's right to use his SBCOS software on the SBCs that it was selling.[12] Bateman contact-

pellees Harry Thompson and David Katz are principals of Mnemonics.

7. The SBCOS comes in chip form and was one of the components that was integrated into the circuit board, or SBC, to render it operational. The parties also refer to this chip as a programmable read only memory ("PROM"). It can be contrasted with a read only memory ("ROM"). A ROM normally is preprogrammed at a factory and cannot be programmed by an individual in the field. A PROM, however, can be plugged into a programming device at any remote location and one can actually program in the software there. Bateman developed several SBCOS PROMs over the years, although the only PROMs at issue on appeal are those that were a component on the boards sold to PAC.

8. Although the exact nature of the relationship between BCS and Bateman is not clear, BCS secured Bateman's permission to sell the boards containing his SBCOS software to Generex. In return for granting BCS this permission, Brunet apparently agreed to pay royalties to Bateman based on the number of circuit boards sold to Generex.

9. There is no dispute that Generex and its successor PAC own the copyright to this parking system application program.

10. In turn, BCS had received these specifications from Bateman.

11. The following explanation of some of the key terms and concepts involved in computer copyright technology may be helpful:

Computer hardware consists of the machine itself, while computer software is the set of instructions, written by computer programmers, that tell the hardware to perform certain tasks. Computer software is generally divided into two categories: operating systems and application programs. Operating systems control the internal operations of the computer and transfer the data between the components of the overall system. In essence, they function as intermediaries between computer hardware and application programs. Application programs tell the operating system to instruct the computer to perform a specific function, such as word processing.

The computer hardware, operating system, application software, and user communicate with each other across "interfaces." The system communicates with the user through the "user interface," which consists of images on the monitor as well as the keyboard, mouse, etc. The interfaces between the application program, operating system, and hardware are internal, and thus are invisible to the user....

For the entire system to function, the components must be "compatible"—i.e., communication must be unimpeded throughout the system.

Timothy S. Teter, Note, *Merger and the Machines: An Analysis of the Pro–Compatibility Trend in Computer Software Copyright Cases*, 45 Stan. L.Rev. 1061, 1063 (1993) (hereinafter "Teter") (footnotes omitted).

Although operating systems and application programs generally perform separate functions, the distinction between them is not always clear and continues to erode as programs become more advanced. "For example, since Lotus 1–2–3 executes 'macros' (user-written command sequences), it can be considered to be a hybrid operating system/application program." *Id.* at n. 15.

12. Bateman claims that he gave Brunet/BCS a license to sell the SBCOS software, but that he terminated the license in the spring of 1988. At the time that Bateman advised Brunet that he was revoking his license, Brunet disputed that their agreement was a license at all, although he did agree that he owed Bateman money and promised to pay as soon as he was financially able. It is important to note that there was no written agreement establishing a license. Rather, Bateman claims that the license was both oral and implied. R8–245–203. Under applicable law, "[a] transfer of copyright ownership, other than by operation of law [*i.e.*, a work for hire], is not valid unless an instrument of conveyance, or note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (1977). The Copyright Act defines "transfer of copyright ownership" as "an

ed Joe Guidage, the president of PAC, to notify him that BCS was no longer authorized to sell the SBC boards containing his SBCOS. Guidage and Bateman decided to do business with one another and apparently bypassed BCS and Brunet. In May of 1988, Bateman negotiated a written agreement with Guidage whereby he and Fricker agreed to design a new SBC, the SBC2, which was to contain an updated version of Bateman's SBCOS software.[13] In addition, the SBC2 was to include programmable array logic ("PAL") technology, which was not included on the SBC1.[14]

Days after the May agreement between Guidage and Bateman was signed, it was repudiated by Thompson, president of Mnemonics, PAC's parent company. A new contract was negotiated and signed in June of 1988, under which Bateman and Fricker agreed to design the SBC2, which would meet certain of PAC's technical requirements. Bateman and Fricker delivered the SBC2 to PAC in June of 1988. In addition, in November of 1988, pursuant to the June contract, Fricker delivered to PAC "engineering" for the board; these materials were

needed in order for PAC to be able to build SBC2s.[15] The hardware logic diagrams at issue in this case were among the documents delivered to PAC by Fricker in November of 1988. Bateman and Fricker acknowledge that there was no copyright notice on the diagrams that were delivered to PAC.

Shortly after delivering the engineering to PAC, Bateman and Fricker realized that they had given PAC their only copy of these materials. Because these materials were needed to manufacture more boards, Bateman and Fricker needed to retrieve them. Fricker received back the engineering materials from PAC, signing a receipt to indicate that PAC had loaned the materials to him; Fricker later returned the materials to PAC. It is these engineering materials that are at issue in Bateman and Fricker's theft of trade secret count against PAC.[16]

By January of 1989, the business relationship between Bateman/Fricker and PAC had deteriorated severely. PAC experienced problems with the SBC2s that were in the field, and the parties disputed the cause of the problems. On January 18, 1989, Bateman and Fricker met with Jack Blalock, the

---

assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (Supp.1995). Thus, if Bateman's purported license was exclusive, the lack of writing is fatal to his claim that there was an oral license. If it was nonexclusive, however, it is not a transfer of ownership for the purposes of the Copyright Act. While Bateman testified that he had granted a nonexclusive license, R8–233–35, and the district court correctly instructed the jury that "[a] nonexclusive license agreement may be granted orally or be implied through the dealings of the parties," Supp. R1–318–96–97, the district court failed to instruct the jury on the importance of distinguishing between exclusive and nonexclusive licenses for copyright purposes. On remand, the district court should clearly instruct the jury on this important legal distinction, should a factual dispute exist on this issue. *See United States v. Costa,* 31 F.3d 1073, 1080 (11th Cir.1994) (noting that the appellate court may give guidance to the district court on issues not directly at issue on appeal but likely to surface on remand).

**13.** The SBC that BCS sold to Generex is referred to by the parties as the "SBC1." The SBC that Bateman and Fricker designed for PAC is re-

ferred to as the "SBC2." At trial, the SBC2 was predominantly at issue and it remains so on appeal. Thus, we refer to this second board as the "SBC2." Any earlier reference in this opinion to the SBC should be understood as a reference to the SBC1.

**14.** PAL technology is used to save space on a circuit board and to conserve power. Fricker testified that PAL enabled him to take all of the discrete logic that was contained in four or five chips on the SBC1 and reduce it to one chip on the SBC2. R8–246–199. Like the SBCOS, PAL manifests itself on a circuit board in the form of a chip.

**15.** Among the materials delivered to PAC were the hardware logic diagrams, the PAL software listings, a disk with the network list, or "net list" on it, and the hole chart for the circuit board. Other materials were included as well. These materials, or "engineering," reflect how the circuit board is actually wired together and were needed in order for PAC to manufacture the SBC2.

**16.** There was no written nondisclosure agreement regarding the engineering materials. The documents were signed for when initially delivered by Fricker to PAC and then signed for again when PAC "loaned" them back to Fricker.

general manager of PAC. PAC's payments were in arrears, while Blalock complained to Bateman and Fricker that their product was not satisfactory. Blalock requested that Bateman and Fricker deliver to PAC the "source code"[17] for the SBCOS and the rights to the SBC2 circuit design in exchange for a release of claims based on the inoperability of the delivered SBC2s, for which PAC had paid Bateman and Fricker $35,000. Bateman and Fricker refused to accept PAC's offer, and, on January 26, 1989, Blalock dispatched a letter to Bateman terminating the contract between Bateman/Fricker and PAC.

After Bateman and Fricker denied PAC's request for the source code for the SBCOS and the rights to the SBC2 circuit design, PAC undertook to compose its own operating system that would interoperate with the application program that it (or its predecessor, Generex) had written to be compatible with Bateman's SBCOS. Tom Colvin, Mnemonic's senior engineer, was assigned this task. He disassembled and decompiled a portion of Bateman's SBCOS from a computer chip resident on one of the previously delivered SBC2s.[18] PAC claims that Colvin was compelled to do this because Bateman had never provided PAC with a

17. In defining and distinguishing between source code and object code, the following explanation is helpful:

> Computer programs are initially written in a "source code," which is a symbolic language, often using English words and common mathematical symbols, that humans can read. The source code is then translated, through a mechanical process known as compilation or assembly, into "object code," which is a concatenation of 1s and 0s readable by computer. Although a skilled programmer can read and understand small sections of object code, it is virtually impossible to develop a working understanding of a program by examining only its object code. As a result, most commercial programs are sold only in object code form, and can be run only "as is" by the ordinary user.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[F] n. 271 (1995) (hereinafter "Nimmer"). *See also E.F. Johnson Co. v. Uniden Corp. of America*, 623 F.Supp. 1485, 1488 (D.Minn.1985) (defining the terms "source code" and "object code").

Since object code is only machine readable, PAC would have had to disassemble and decompile it for it to be of any use. *See* Robert A. Kreiss, *Accessibility and Commercialization in Copyright Theory*, 43 UCLA L.Rev. 1, 32 n. 110 (1995) (hereinafter "Kreiss") (noting that "object code, in the vast quantities found in normal computer programs, is not, as a practical matter, humanly accessible to programmers"). "Disassembly," which is a reverse engineering term that includes both disassembly and decompilation, " 'is a procedure for translating the machine language program into an assembly language program.' " Kreiss, at 3 n. 8 (quoting Office of Technology Assessment, *Finding A Balance: Computer Software, Intellectual Property and the Challenge of Technological Change* 146 (1992)). Thus, PAC requested the source code for Bateman's SBCOS, which would have afforded greater insight into the workings and structure of the SBCOS software; in particular, it

would have provided PAC with any accompanying programmer notes.

18. As noted in note 17, *supra*, there is an important technical distinction between the source code and the object code. Generally, the object code is readable only by machines. But, as Professor Nimmer notes:

> The skilled programmer, however, may reverse engineer the program by using the techniques of "decompilation" and "disassembly" to work backwards from object code and to produce a facsimile of the original source code. Although decompilation techniques generally will not yield a perfect copy of the original source code, decompilation can afford an understanding of much of the structure and operation of a program.

3 Nimmer § 13.03[F] n. 271 (citation omitted).

PAC utilized the techniques of disassembly and decompilation on Bateman's SBCOS. PAC claims that such reverse engineering was necessary to develop an operating system compatible with its application program, which in turn was written to be compatible with Bateman's SBCOS. Although the issue is not directly before us on appeal, it will likely appear on remand, and thus we think it proper to address it and thereby provide some guidance to the district court on remand. *See United States v. Costa*, 31 F.3d 1073, 1080 (11th Cir.1994). And although there has been some uncertainty as to whether reverse engineering constitutes copyright infringement, the one federal circuit court that has squarely addressed the issue has concluded that reverse engineering may be a fair use. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527–28 (9th Cir.1992) (holding that "where disassembly is the only way to gain access to the ideas and functional elements embodied in a copyrighted computer program and where there is a legitimate reason for seeking such access, disassembly is a fair use of the copyrighted work, as a matter of law"). Another federal circuit court has addressed the issue, although its highly unusual factual posture seems to limit its precedential value. *See Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832,

copy of the source code for his SBCOS. PAC also claims that Colvin identified those elements of the program that were necessary for compatibility with the preexisting application program and incorporated them into PAC's new operating system, known as the Lane Control Computer Operating System ("LCCOS"). In addition to composing the LCCOS, PAC also designed a new circuit board, known as the Lane Control Computer ("LCC"), which was to replace Bateman and Fricker's SBC2.

Shortly after the January contract termination by PAC, Bateman and Fricker filed suit in Florida state court, alleging breach of the June 2, 1988 contract.[19] They subsequently learned that PAC was marketing a new computer circuit board that appeared to perform the same functions as their SBC2. In May of 1990, Bateman and Fricker initiated this case in federal court in Florida, alleging, *inter alia*, copyright infringement and theft of trade secrets.

## II. ISSUES ON APPEAL

On appeal, PAC raises eight issues, and Bateman and Fricker present one issue on cross-appeal. The issues on direct appeal are whether: (1) a jury instruction that limited the "successive filtration" test for copyright infringement to nonliteral similarity was confusing or misleading; (2) the district court should have instructed the jury to filter out the operating system/application program interface; (3) it was plain error to instruct the jury that a "qualitatively" small amount of copying could authorize a finding of copyright infringement; (4) the district court erred in directing a verdict striking PAC's omission of copyright notice defense because it found that one copy was a "relatively small number" under the Copyright Act, as a matter of law; (5) the district court erred in denying PAC's motions for directed verdict and JNOV as to claims of copyright infringement in hardware logic diagrams, where the only evidence of damages was the sale of purely utilitarian circuit boards built from them; (6) the district court erred in denying PAC's motions for directed verdict and JNOV as to damages based on sales of circuit boards where Bateman and Fricker failed to introduce evidence that "translations" of their schematics purportedly used in manufacturing circuit boards contained any protectable expression; (7) the district court should have vacated the jury's award of $120,000 in damages for infringement of the hardware logic diagram's copyright, where there was no evidence that any boards were manufactured after PAC had notice of the copyright claim; and (8) the district court erred in denying PAC's motions for directed verdict and JNOV on the state law trade secret claim. The sole issue on cross-appeal is whether the district court abused its discretion in refusing to award exemplary damages on Bateman and Fricker's trade secret claim of Count VI under Fla.Stat. § 688.004(2), given the evidence that supported the jury verdict in Bateman and Fricker's favor on this count.

843 (Fed.Cir.1992) (concluding that "reverse engineering object code to discern the unprotectable ideas in a computer program is a fair use," although denying the defendant's fair use claim, based on the fact that it was wrongfully in possession of the source code). We find the *Sega* opinion persuasive in view of the principal purpose of copyright—the advancement of science and the arts. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991) (noting that "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts'") (quoting U.S. Const. art. I, § 8, cl. 8). We note that we are in good company in endorsing the approach of the *Sega* court. Eleven copyright law professors filed an amicus curiae brief in the *Sega* case in which they endorsed this approach. *See* Kreiss, at 4 n. 9 (citing Brief *Amicus Curae* [sic] of Eleven Copyright Law Professors in *Sega Enterprises Ltd. v. Accolade, Inc.*, 33 Jurimetrics J. 147, 155 (1992)). For an extensive list of law review articles discussing the *Sega* and/or *Atari* cases, see Kreiss, at 61 n. 226. As discussed subsequently in this opinion, an important distinction to be emphasized is that reverse engineering, in addition to accessing nonprotectable ideas and functional elements, may also yield access to original expression. However, while the former may be unoriginal and not worthy of copyright protection, the latter, though original and hence copyrightable, may also be denied protection where its use is found to be "fair" under 17 U.S.C. § 107.

19. This case never went to trial, and the record is silent as to its outcome. The breach of contract claim is not part of the case before us on appeal.

## III. DISCUSSION

### A. The *Feist* Two–Pronged Test for Copyright Infringement

 At the outset, we review some applicable basic principles. To establish a claim of copyright infringement, Bateman and Fricker must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *see also BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.*, 999 F.2d 1436, 1440 (11th Cir.1993) (en banc), *cert. denied,* — U.S. —, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). To "satisfy *Feist*'s first prong, a plaintiff must prove that the work ... is original and that the plaintiff complied with applicable statutory formalities." *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'd by an equally divided Court,* — U.S. —, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996) (citation omitted). In judicial proceedings, a "certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1977).[20] Once the plaintiff produces a certificate of copyright, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid. *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir.1990). At this juncture, it is incumbent upon a putative infringer to establish that the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that the portion of the copyrighted work actually taken is unworthy of copyright protection.[21] In the case before us, Bateman has a registration of his claim of copyright in his SBCOS software, and Bateman and Fricker jointly have been issued a copyright registration in the hardware logic diagrams for the SBC2. PAC does not contest the validity of these copyright registrations and thus *Feist*'s first prong is satisfied.

 It is *Feist*'s second prong that is a central focus of this case. To prove actionable copying, the plaintiff must first establish, as a factual matter, that the alleged infringer "actually used the copyrighted material to create his own work." *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir.1994). Proof of copying may be shown either by direct evidence of the copying or, in the absence of such evidence, "[c]opying as a factual matter typically may be inferred from proof of access to the copyrighted work and 'probative similarity.' " *Id.* (citing *Plains Cotton Co-op. Ass'n v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1260 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987)). Factual proof of copying, however, is only an element in satisfying the second prong of *Feist*.

20. Although a timely obtained certificate of registration constitutes prima facie evidence of the validity of the claim of copyright, this presumption is rebuttable. *See Autoskill, Inc. v. National Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993); *Donald Frederick Evans v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir.1986).

21. Initially, the task is to distinguish between protectable expression and unprotectable "methods of operation," "processes," and the like. 17 U.S.C. § 102(b). Where a portion of the computer program constitutes an unprotectable method of operation or process, it is not an expressive part of the work. It is particularly important to exclude methods of operation and processes from the scope of copyright in computer programs because much of the contents of computer programs is patentable. Were we to permit an author to claim copyright protection for those elements of the work that should be the province of patent law, we would be undermining the competitive principles that are fundamental to the patent system. *See Baker v. Selden*, 101 U.S. 99, 102–03, 25 L.Ed. 841 (1879); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146–47, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989); *Atari*, 975 F.2d at 842. *But see* Pamela Samuelson et al., *A Manifesto Concerning the Legal Protection of Computer Programs*, 94 Colum.L.Rev. 2308, 2343–47 (1994) (arguing that patent law is ill-suited for protecting computer software innovation). After these originality challenges have been determined, the putative infringer also may advance a claim that, while the portion of the work actually taken is original and thus copyright worthy, the use made thereof is "fair" under 17 U.S.C. § 107. Conceptually and legally it is important to distinguish these two denominated "defenses."

It is at this point that the plaintiff must also respond to any proof advanced by the defendant that the portion of the copyrighted work actually taken does not satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl. 8. *See also Feist,* 499 U.S. at 345–46, 111 S.Ct. at 1287–88 (noting that "[t]he *sine qua non* of copyright is originality," as well as emphasizing that it is a "constitutional requirement"). If the plaintiff successfully demonstrates that the portion of the copyrighted work taken satisfies the originality requirement, he must still, depending upon the proof of the defendant and the defenses asserted, surmount two additional hurdles. First, the plaintiff must prove that "the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." *Lotus,* 49 F.3d at 813; *see also Engineering Dynamics,* 26 F.3d at 1341. Second, he may have to successfully challenge the putative infringer's evidentiary assertion that the use made of the original portion of the copyrighted work is a fair use under 17 U.S.C. § 107, where the putative infringer attempts to carry his burden and demonstrate a right to such use.[22] In this appeal, both the originality/substantial similarity aspect of *Feist*'s second prong and fair use are at issue, although we note that proof of originality can be the more problematic of the two hurdles to overcome; while there may be evidence of copying, not all copying is legally actionable. *See Engineering Dynamics,* 26 F.3d at 1341; *BellSouth,* 999 F.2d at 1444–45.

For the reasons discussed, we need not consider *Feist*'s first prong. The factual copying aspect of *Feist*'s second prong is not at issue either, because PAC admits that it copied portions of the SBCOS code and the SBC2 logic circuit diagrams during the design and development of the LCCOS and the LCC. Thus, the two matters directly at issue on appeal as to Count I are whether: (1) the copying done by PAC is legally actionable; that is, whether there is "substantial similarity" between the allegedly offending program and the protectable, original elements of the copyrighted works; and (2) the use of any such original elements qualifies as a fair use under 17 U.S.C. § 107.[23] At the heart of these issues is the

---

**22.** Fair use traditionally has been treated as an affirmative defense to a charge of copyright infringement *See Campbell v. Acuff–Rose Music, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1164, 1177, 127 L.Ed.2d 500 (1994) (stating that "fair use is an affirmative defense"). In viewing fair use as an excused infringement, the court must, in addressing this mixed question of law and fact, determine whether the use made of the original components of a copyrighted work is "fair" under 17 U.S.C. § 107. *See Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (citing *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1495 n. 8 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985)). Although the traditional approach is to view "fair use" as an affirmative defense, this writer, speaking only for himself, is of the opinion that it is better viewed as a right granted by the Copyright Act of 1976. Originally, as a judicial doctrine without any statutory basis, fair use was an infringement that was excused—this is presumably why it was treated as a defense. As a statutory doctrine, however, fair use is not an infringement. Thus, since the passage of the 1976 Act, fair use should no longer be considered an infringement to be excused; instead, it is logical to view fair use as a right. Regardless of how fair use is viewed, it is clear that the burden of proving fair use is always on the putative infringer.

**23.** Before embarking upon any infringement analysis, it is vital to understand that infringing conduct is the unpermitted exercise of a right of the copyright owner. To properly apply that principle, it is equally important to remember that there exists a distinction between the work and the copyright. The work—in this case a computer program—is separate and distinct from the copyright; the copyright is the rights to which the copyrighted work is subject. It is the rights, not the work, that the copyright holder owns. This distinction is manifest in view of the fact that when the copyright expires, the erstwhile copyright holder no longer owns any exclusive rights, but the work continues to exist without change. The copyright owner never owns the work because copyright is a series of specified rights to which a designated work is subject for a limited period of time, after which the work enters into the public domain unencumbered by copyright. Hence, the use of the work and the use of the copyright are distinct. One may use the work without using the copyright, but one cannot use the copyright without using the work—one does not infringe the work, rather one infringes the copyright. Thus, "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright...." 17 U.S.C. § 501(a). Therefore, the basic issue in all copyright defenses is whether the use involved was a use of the work or a use of the copyright. *See generally* L. Ray Patterson,

parties' dispute over the district court's jury instructions on literal and nonliteral copying, to which we now turn.

### B. The Jury Instructions

■■■■ PAC raises three separate issues on appeal concerning the district court's instructions to the jury. "We apply a deferential standard of review to a district court's jury instructions. So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir.1995) (citing *McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504, 1509 (11th Cir.1990)). "On appeal, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 (11th Cir.1991) (citations omitted). Under this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed. *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981). We must reverse an erroneous instruction, however, if we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson v.*

*Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982) (quoting *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981)). Instructing a jury in the application of the law of copyright, which is characterized by often subtle and contradictory distinctions, is indeed a daunting task. Thus, the need for proper guidance is accentuated and heightened in directing a jury in this area of the law, which may be foreign to many jurors, particularly in this rapidly changing technological world. Applying the aforementioned standard of review, we examine *seriatim* the three issues on appeal relating to the jury instructions.

#### 1. Limiting the "Abstraction–Filtration–Comparison" Test to Nonliteral Similarity

■■■■ PAC asserts that the district court committed reversible error by instructing the jury to filter out only nonliteral similarities in applying the "abstraction-filtration-comparison" test for substantial similarity that the Second Circuit adopted in *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir.1992).[24] PAC requested jury instructions that allowed for filtering out all nonprotectable (that is, unoriginal) expression, without regard to whether the similarity existed on the literal or nonliteral level.[25] The district

*Understanding Fair Use*, Law & Contemp.Probs., Spring 1992, at 259, 264 (noting the distinction between the work and the copyright of the work).

24. Throughout their briefs, the parties refer to this test as the Nimmer "successive filtration" test. In instructing the jury, the district court also referred to this test as the "Nimmer test." Supp. R1–318–92. While we certainly recognize that the *Altai* court endorsed Professor Nimmer's "successive filtering method" for separating protectable expression from nonprotectable material, the test set forth in *Altai* is more comprehensive than that formulated by Professor Nimmer. The jury instructions were clearly based on the *Altai* version of the Nimmer test, and therefore any reference in this opinion to the "Nimmer test" is to be understood as a reference to the *Altai* version of the Nimmer test.

25. Two works need not be identical in order to be deemed "substantially similar" for purposes of copyright infringement. As Judge Learned Hand noted, "[i]t is of course essential to any protection of literary property ... that the right cannot be limited literally to the text, else a

plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). The problem with computer programs is that "between the one extreme of no similarity and the other of complete and literal similarity lies the line marking off the boundaries of 'substantial similarity.'" 3 Nimmer § 13.03[A]. The exact location of this line is difficult to pinpoint.

It is in this substantial similarity analysis that one must distinguish between literal and nonliteral similarity. Literal similarity refers to similarity at the code level; that is, there is a verbatim copying of part or all of the source or object codes of a computer program. Nonliteral similarity is more difficult to define. Professor Nimmer refers to it as "comprehensive nonliteral similarity," and notes that the term "similarity" is not limited to a particular line or paragraph of a work, but refers rather to where "the fundamental essence or structure of one work is duplicated in another." *Id.* at § 13.03[A][1]. Thus, nonliteral similarity can be thought of as paraphrasing or copying the essence or struc-

court denied PAC's request and accepted instead Bateman's proposed instructions, which confined the filtration analysis only to instances of nonliteral copying. By limiting the filtration instruction to nonliteral similarities, PAC claims that the district court effectively rendered futile its efforts to rebut Bateman's evidence of literal similarity with regard to elements of the work for which copyright was claimed, thereby nullifying several of its key defenses, including compatibility, efficiency, and standard programming techniques. Bateman and Fricker, however, assert that the district court was correct in limiting the filtration instruction to nonliteral similarities.

The Second Circuit in *Altai* summarized its abstraction-filtration-comparison test as follows:

> In ascertaining substantial similarity under this approach, a court would first break down the allegedly infringed program into its constituent structural parts. Then, by examining each of these parts for such things as incorporated ideas, expression that is necessarily incidental to those ideas, and elements that are taken from the public domain, a court would then be able to sift out all non-protectable material. Left with a kernel, or possible kernels, of creative expression after following this process of elimination, the court's last step would be to compare this material with the structure of an allegedly infringing program. The result of this comparison will determine whether the protectable elements of the programs at issue are substantially similar so as to warrant a finding of infringement.

*Altai,* 982 F.2d at 706. In the case at bar, it is *Altai*'s second step, filtration, that most concerns us. Filtration is used to separate protectable expression from nonprotectable

material. It is at this step that the structural components at each level of abstraction are examined "to determine whether their particular inclusion at that level was 'idea' or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression." *Altai,* 982 F.2d at 707. It is here that PAC claims that merger, *scenes a faire,* and other originality challenges to literal copying should be applied.

The district court's instruction limited the filtration analysis to nonliteral similarity, stating that:

> Under the Nimmer test, substantial similarity of the non-literal elements is determined by comparing with the defendants' program, that protectable expression of the copyrighted work which remains after filtering out any portion of the copyrighted work, which represents only ideas, elements[ ] dictated solely by logic and efficiency, elements dictated by hardware or software standards, computer industry programming and practices or elements which are taken from the public domain.

> Even a qualitatively [sic] small amount of copied material which remains unfiltered may be sufficiently important to the operation of Mr. Bateman's operating system program to justify a finding of substantial similarity. For instance, a small portion of a structure or code of a program may nonetheless give it its distinctive features. In such a case, a finding of substantial similarity would be appropriate.

Supp. R1–318–92–93. This instruction is a verbatim version of Bateman's proposed instruction on determining substantial similarity under the Nimmer test. At the time that this instruction was offered by Bateman,

---

ture of a work just short of literal copying. Both literal and nonliteral similarity may warrant a finding of copyright infringement, although we note that the application of these theories becomes more difficult as cases assume an increasing technological complexity. In the computer code environment, one may write code that, when processed by the computer, produces a screen display that is virtually identical to another screen display that was generated from unquestionably dissimilar code. *See Digi-*

*tal Communications Assocs. v. Softklone Distrib. Corp.,* 659 F.Supp. 449, 455 (N.D.Ga.1987) (noting that "a computer screen display can be copied by means of a computer program which is not itself a copy of the computer program which generated the screen display which has been copied"). Such an instance would not warrant a finding of literal code copying, but could constitute an infringement of the portion of the screen display that properly qualified for protection.

PAC submitted its own version of a filtration instruction, one that would direct the jury to filter out all nonprotectable expression, *without regard to whether the similarity existed on the literal or nonliteral level*. PAC objected to Bateman's instruction when first offered to the court, Supp. R1–330–325, and also objected to the court's decision to use Bateman's instruction, which contained the nonliteral limitation, rather than PAC's version of the filtration analysis. Supp. R1–332–74. Over both· of these objections, the district court limited the filtration instruction to nonliteral similarities.

We recognize that the *Altai* test was formulated by the Second Circuit to help "determine the scope of copyright protection that extends to a computer program's nonliteral structure." *Altai*, 982 F.2d at 703. In fact, other circuit courts disagree on whether its application should be limited to instances of nonliteral copying, or whether it is equally applicable to cases involving literal copying. *See Lotus*, 49 F.3d at 815 (noting that "[w]hile the *Altai* test may provide a useful framework for assessing the alleged nonliteral copying of computer code, we find it to be of little help in assessing whether the literal copying of a menu command hierarchy constitutes copyright infringement"). *But see Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823 (10th Cir.1993) (elaborating upon the *Altai* test and endorsing it as a way of determining whether "menus and sorting criteria" are protectable by copyright).

We see this disagreement between the *Lotus* and *Gates* courts as more of a matter of semantics than substance. It is undeniable that the *Altai* court formulated its test to address nonliteral copying of computer code. Even if the *Altai* test is limited to nonliteral copying, however, a parallel type of analysis must be undertaken in examining alleged instances of literal copying of computer code or screen displays.[26] Whether one chooses to call the consideration of such generally recognized challenges to literal code copying as merger and efficiency "filtration" is of little consequence; what matters is that these well-established "defenses" are considered. The *Gates* court simply chose to include this consideration as part of its filtration analysis, noting that "[f]iltration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination." *Gates*, 9 F.3d at 834.

We express no opinion as to whether it is better to consider these challenges to literal copying as part of the filtration step or rather to consider them in a separate, yet parallel, analysis. The important point here is that such an analysis is necessary—it makes little difference which methodology is employed.[27] Where the district court erred, however, was in not requiring the jury to consider the connection between the *Altai* test and the challenges to originality, such as merger, *scenes a faire*, standard technique or practice, considerations of efficiency, compatibility requirements, and the like. Since the district court instructed the jury that *Altai* filtration was limited to nonliteral copying, the jury must have concluded that any instances of literal copying of Bateman's code by PAC were by definition acts of copyright infringement. This conclusion is a manifest distortion and misstatement of the law. There was substantial evidence presented of the *literal copying* of code in this case. Much of the testimony of the expert witnesses dealt with the Nimmer test and its role as the proper methodology to employ in analyzing the copyright infringement claims

---

**26.** Screen displays are the products of a program and are not considered to be a literal element of a program. They fall "under the copyright rubric of audiovisual works." *Altai*, 982 F.2d at 703. Although screen displays are the product of a computer program, in contrast to source and object code, which are part of the program itself, the legal analysis for alleged instances of literal copying of either code or screen displays is analytically quite similar.

**27.** It is essential that one keep in mind that the approaches adopted by the other circuits merely are a means to a very important end: filtering out all unprotectable material. Sometimes parties become so engrossed in disputing what "test" should apply that they lose sight of what the tests were designed to accomplish in the first place. To paraphrase a sage observer, "If you don't know where you're goin', when you get there you'll be lost."

of Bateman and Fricker. When this testimony was combined with the jury instruction limiting filtration analysis to *nonliteral copying*, it is clear that the jury was misled and did not fully understand the law of copyright relevant to this case. Under the standard established in *Miller,* we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." 650 F.2d at 1372.

### 2. The Failure to Instruct the Jury on the Legal Consequences of Copying Elements Dictated by Compatibility Requirements

■■■■■ PAC also claims that the district court erred in not instructing the jury on the legal consequences of a finding that certain instances of literal copying of code by PAC were dictated by compatibility and interoperability requirements. The district court gave no instruction on whether the application program/SBCOS interface at issue in this case was a constraint that rendered the interface either unprotectable or subject to a fair use analysis.[28] In its instructions, the court noted that "[c]omputer programs are, in essence, utilitarian articles. Articles that accomplish tasks. As such, they contain many structural and visual display elements that may be dictated by the function to be performed, by considerations of efficiency, or by external factors, such as compatibility requirements and industry demands." Supp. R1–318–95.

■■■■ PAC proposed an instruction that stated, in part, that "you are to filter out as unprotectable expression portions of the program that the evidence shows were dictated by the interface with the applications code which was an external constraint." R7–216 (Instruction No. 26). Bateman objected to this instruction, noting that he had introduced evidence that PAC's application program could have been rewritten to avoid using the interface commands;[29] the court, while not expressly adopting Bateman's argument, noted that the issue was far from clear and refused to charge the portion of PAC's proposed instruction quoted above. Supp. R1–332–71.

The instruction given by the court is not technically incorrect. It fails, however, to define the important term "compatibility"[30] and, more importantly, fails to instruct the jury on the legal consequences of a finding that certain copying of code by PAC was dictated by compatibility requirements. When this instruction is considered together with the "Nimmer instruction," which was limited to nonliteral similarity, it is clear that the court failed to instruct the jury that compatibility, whether it pertains to originality or fair use analysis, is a consideration that applies at the literal level.

28. We emphasize here that although unoriginality and fair use, when related to compatibility considerations, are closely related copyright issues, they are analytically distinct. Compatibility and other functionality challenges to originality, if found to be applicable, are applied so as to deny copyright protection to a particular work or portion of a work. 17 U.S.C. § 102(b). In contrast, fair use is a doctrine that is applied *after* a finding has been made that a work or portion of a work is entitled to copyright protection. 17 U.S.C. § 107.

29. The availability of alternatives should not be determinative in distinguishing between elements of a computer program that are expressive and those that are unprotectable under 17 U.S.C. § 102(b). Generally, there is more than one method of operation or process that can be used to perform a particular computer program function. However, methods of operation and processes are not copyrightable. But tension exists in the Act as to what a "process" or "method of operation" is in the context of computer programs. *See* Jane C. Ginsburg, *Four Reasons and*

*A Paradox: The Manifest Superiority of Copyright Over Sui Generis Protection of Computer Software,* 94 Colum.L.Rev. 2559, 2560–70 (1994). Patents routinely recite prior methods or systems of performing the same function in distinguishing the claimed invention from the prior art.

30. As one commentator has noted:

Compatibility becomes an issue when a firm wishes to create a single new component designed to operate with elements of a preexisting system. For example, if manufacturer "B" would like to design a computer that can use software designed for a computer manufactured by "A," *B's operating system interface must match that of manufacturer A.* Without that compatibility, the software designed for A's machine will not function on B's.

Teter, at 1064 (emphasis added).

Although the factual situation in this hypothetical is not identical to the case at bar, it is close enough to highlight the importance of the operating system interface.

 This circuit has yet to address whether interface specifications, *as a matter of law,* are not entitled to copyright protection. In its briefs, PAC argues that Bateman's interface commands are legally uncopyrightable and, thus, PAC was not obligated to avoid copying them by rewriting its application program. At other times, it makes the alternative argument that the district court should have instructed the jury on the legal consequences of copying dictated by compatibility requirements. To the extent that it was making the former argument, we reject it.[31] It is an incorrect statement of the law that interface specifications are not copyrightable as a matter of law.[32] PAC is correct, however, in arguing that the district court erred in not instructing the jury on the legal consequences of copying dictated by compatibility requirements.

In analyzing elements dictated by external factors, the Second Circuit in *Altai* cited Professor Nimmer for the proposition that " 'in many instances it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques.' " *Altai,* 982 F.2d at 709 (quoting 3 Nimmer § 13.03[F][3], at 13–65). The *Altai* court further elaborated on this point by noting that programmers are often constrained in their design choices by "extrinsic considerations" including "the mechanical specifications of the computer on which a particular program is intended to run" and "compatibility requirements of other programs with which a program is designed to operate in conjunction." *Id.* at 709–10 (citing Nimmer, at 13–66–71). The Ninth Circuit has similarly noted that computer programs "contain many logical, structural, and visual display elements that are dictated by ... external factors such as compatibility requirements and industry demands," and that "[i]n some circumstances, even the exact set of commands used by a programmer is deemed functional rather than creative for purposes of copyright." *Sega,* 977 F.2d at 1524.

 The *Sega* and *Altai* courts are certainly not alone in noting that external factors such as compatibility may work to deny copyright protection to certain portions of a computer program. *See also Engineering Dynamics,* 26 F.3d at 1347 n. 12.; *Atari,* 975 F.2d at 839. Whether the protection is unavailable because these factors render the expression unoriginal, nonexpressive per 17 U.S.C. § 102(b), or whether these factors compel a finding of fair use, copyright estoppel, or misuse, the result is to deny copyright protection to portions of the computer program. Thus, we today join these other circuits in finding that external considerations such as compatibility may negate a finding of infringement.[33] In the case at bar, we need not decide whether PAC's alleged copying constitutes an infringement. It is clear that the jury was not properly instructed on the legal principles involved in such an analysis, and thus we are "left with a substantial and ineradicable doubt as to whether the jury

---

**31.** We need not decide whether PAC is correct in its assertion that, given the particular facts of this case, it was not obligated to rewrite its application program to avoid copying Bateman's interface specifications. PAC, however, is incorrect in arguing that this rewriting was not required because Bateman's interface specifications are not entitled to copyright protection *as a matter of law.*

**32.** As noted above, simply because something is copyrightable does not mean that it is entitled to copyright protection. The expression at issue may be found to be unoriginal through application of the merger doctrine or under 17 U.S.C. § 102(b). And even if the expression is found to be original, fair use may be demonstrated by the alleged infringer to defeat the claim of infringe-

ment. This latter analysis will depend upon the facts in the particular case, since a use by one putative infringer may be "fair" while the use by another may not so qualify under 17 U.S.C. § 107. *See* L. Ray Patterson & Stanley W. Lindberg, *The Nature of Copyright: A Law of Users' Rights* 163–241 (1991).

**33.** Note that we use the word "may." Such a finding will depend on the particular facts of a case, and thus it would be unwise for us to try to formulate a bright-line rule to address this issue, given the importance of the factual nuances of each case. In no case, however, should copyright protection be extended to functional results obtained when program instructions are executed and such results are processes of the type better left to patent and trade secret protection.

was properly guided in its deliberations." *Miller,* 650 F.2d at 1372.

### 3. *"Qualitatively" or "Quantitatively"*

█ Further, we address PAC's claim that the district court erred in instructing the jury that "[e]ven a *qualitatively* small amount of copied material which remains unfiltered may be sufficiently important to the operation of Mr. Bateman's operating system program to justify a finding of substantial similarity. For instance, a small portion of a structure or code of a program may nonetheless give it its distinctive features. In such a case, a finding of substantial similarity would be appropriate." Supp. R1–318–93 (emphasis added). There is no dispute among the parties that this instruction should have contained the word "quantitatively," not "qualitatively." It is not clear, however, that the judge misspoke, because the written charges that were with the jury during their deliberations correctly read "quantitatively small amount"; the court reporter may have simply heard or transcribed the word incorrectly. Regardless of what actually happened, PAC admits that it did not object to the instruction when it was given.

█ "[I]f no objection to the instructions was raised at trial, we only review for plain error." *Starke,* 62 F.3d at 1380 (citing *United States v. Andrews,* 850 F.2d 1557, 1559 (11th Cir.1988), *cert. denied,* 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989)). Under the plain error standard, an instruction will not be reversed "unless 'the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice,' or the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Pepe,* 747 F.2d 632, 675 (11th Cir.1984) (quoting *United States v. Thevis,* 665 F.2d

616, 645 (5th Cir. Unit B), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, *and cert. denied,* 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, *and cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)). Analyzing this alleged misstatement in the oral jury instruction, it is clear to us that it does not constitute plain error.

### C. Infringement of the Hardware Logic Diagrams

█ PAC raises four separate issues on appeal concerning the jury award for Bateman and Fricker for PAC's alleged infringement of the copyrighted hardware logic diagrams (Count II). Given our conclusion regarding the improper jury instructions as to Count I and our resultant order of a new trial, we need not address in detail the issues on appeal as to Count II.[34] Federal Rule of Civil Procedure 59(a) permits a court to grant a new trial "on all or part of the issues." The Supreme Court has set forth the standard governing the grant of new trials, and it is as follows: "[w]here the practice permits a partial new trial, it may not properly be resorted to *unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.*" *Gasoline Prods. Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) (emphasis added); *see also Overseas Private Inv. Corp. v. Metropolitan Dade County,* 47 F.3d 1111, 1113 (11th Cir.1995) (quoting same).

█ Given this standard, we do not believe that a partial new trial only as to Count I would be proper here. We are convinced that the jury was not properly instructed on Count II, and that the general instructions relative to distinguishing copyrightable subject matter from unprotectable work mani-

---

**34.** Because it may resurface on remand, we briefly address one of the issues on appeal regarding the hardware logic diagrams. We find that the district court was correct in concluding that Fricker's delivery of a single copy of the hardware logic diagrams to PAC, even though it did not contain a copyright notice on it, was not a public distribution and thus the forfeiture provisions of 17 U.S.C. § 405 do not come into play. We disagree, however, with the district court's

finding that, *as a matter of law,* one copy is a "relatively small number" under 17 U.S.C. § 405(a)(1). *See Donald Frederick Evans,* 785 F.2d at 910 (noting that the question of what constitutes a "relatively small number" under the savings provision of § 405(a)(1) "cannot be answered merely by reference to an absolute number" and rather "must be answered on a case-by-case basis in light of the totality of the circumstances").

festly infected the deliberative processes of the jury with regard to its evaluation of the infringement claims under Count II. It is quite clear that Counts I and II, although ostensibly involving infringement of separately copyrighted material, are not "so distinct and separable" from one another to permit a retrial of only one "without injustice"; stated differently, the two counts are sufficiently interwoven and intertwined so as to require a new trial on both counts. *See, e.g., Shessel v. Murphy,* 920 F.2d 784, 787 (11th Cir.1991); *FIGA v. R.V.M.P. Corp.,* 874 F.2d 1528, 1534 (11th Cir.1989). Therefore, we vacate the judgment of the district court as to Count II as well and remand for a new trial.

### D. The Trade Secret Misappropriation Claim

Although Counts I and II are clearly intertwined, Count VI, a pendent state law trade secret claim, is separate and distinct from Counts I and II, and thus we must fully discuss the issues relevant to it on appeal. PAC contends that the district court erred in denying its motions for directed verdict and JNOV on the trade secret claim. Bateman and Fricker, in their sole issue on cross-appeal, contend that the district court abused its discretion in refusing to award exemplary damages on their trade secret claim pursuant to Fla.Stat. § 688.004(2), given the evidence that supported the jury verdict in Bateman and Fricker's favor on this count.

 Our review of the district court's disposition of motions for a directed verdict and JNOV is *de novo. Colvin v. Housing Auth. of Sarasota,* 71 F.3d 864, 866 (11th Cir.1996) (per curiam). The appellate court employs the same standard utilized by the district court in determining whether to grant the motions—"[w]e review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," and "[i]f the facts and inferences are so strong and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the grant of a directed verdict is proper." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555

(11th Cir.1995) (citation omitted). What is required in order for the motion to be denied is substantial evidence of "such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* As this court has stated before, however, "a jury question does not exist because of a 'mere scintilla of evidence'; rather, '[t]here must be a conflict in substantial evidence to create a jury question.'" *Id.* (quoting *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969)), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990).

 In the case at bar, Bateman and Fricker's state law trade secret claim is predicated upon the existence of an implied confidential relationship. Given the backdrop of federal preemption pursuant to section 301 of the Copyright Act, we must carefully review this state law claim to ascertain whether it requires an "extra element" for recovery, for "[a] state law claim is not preempted if the 'extra element' changes 'the nature of the action so that it is *qualitatively* different from a copyright infringement claim.'" *Altai,* 982 F.2d at 716 (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985)). As a general matter, state law trade secret statutes have been deemed not to be preempted because the plaintiff must prove the existence and breach of a confidential relationship in order to prevail. As the court in *Altai* stated, "[t]he defendant's breach of duty is the gravamen of such trade secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying." *Id.* at 717.

 We have no doubt that the Florida trade secret statute at issue satisfies the "extra element" test generally employed by courts in performing copyright preemption analysis. However, we find that the evidence presented by Bateman and Fricker, even viewed in the light most favorable to them, fails to establish the existence of a confidential relationship sufficient to trigger liability.

We are wary of any trade secret claim predicated on the existence of an "implied" confidential relationship, because we are aware that artful pleading and presentation of evidence seemingly may create a pendent state law claim that in actuality is nothing more than a dressed up version of a copyright infringement claim. Bateman and Fricker are correct in asserting that Florida law recognizes implied confidential relationships sufficient to trigger trade secret liability. *See Dotolo v. Schouten,* 426 So.2d 1013, 1015 (Fla.Dist.Ct.App.), *petition for review denied,* 434 So.2d 888 (Fla.1983). However, the Florida cases, as well as those in other jurisdictions recognizing such an implied confidential relationship, all involve situations in which the party claiming trade secret misappropriation made it clear to the parties involved that there was an expectation and obligation of confidentiality. In the case at bar, it is not the lack of a written confidentiality agreement that is fatal to the trade secret claim; rather, it is the lack of any substantial evidence that PAC was ever made aware of any obligation of confidentiality to Bateman and Fricker regarding the engineering materials at issue.[35] Absent such a showing, all that remains of Bateman and Fricker's trade secret claim is their unilateral assertion that they had an implied confidential relationship with PAC. We find that, based on the record before us, Bateman and Fricker failed to produce sufficient evidence as to the existence of the implied confidential relationship, and thus PAC was entitled to judgment as a matter of law on this count. Therefore, the district court erred in failing to grant PAC's motions for directed verdict and JNOV, and the judgment of the district court on the trade secret misappropriation claim is reversed.[36]

## IV. CONCLUSION

The district court committed reversible error as to Count I both in improperly instructing the jury to filter out only instances of nonliteral copying in the "substantial similarity" analysis, and in not instructing the jury on the legal consequences of copying dictated by compatibility requirements. Since Count I and Count II are not "so distinct and separable" as to permit a partial new trial on Count I alone, the judgment of the district court is VACATED on Counts I and II, and the case is REMANDED for a new trial on these counts. The judgment of the district court on the trade secret misappropriation count is REVERSED, and the district court is instructed to enter judgment as a matter of law for PAC on the trade secret count.

VACATED IN PART; REVERSED IN PART, and REMANDED.

---

**35.** Bateman and Fricker contend that the fact that PAC signed for the engineering materials when Fricker delivered them to it and the fact that it required Fricker to sign them out when they were "loaned" back to him is strong evidence that PAC treated these materials as trade secrets. We are unpersuaded by this contention—the mere fact that PAC employed standard business inventory practices does not create the

confidential relationship that is needed for Bateman and Fricker to prevail on their trade secret misappropriation claim.

**36.** In light of our resolution of the trade secret issue, we need not address Bateman and Fricker's cross-appeal concerning the award of exemplary damages under Fla.Stat. § 688.004(2).