[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
03/05/99
THOMAS  K. KAHN
CLERK

No. 95-3000

D. C. Docket No. 93-929-CIV-ORL-19

ROBERT MONTGOMERY,

Plaintiff-Appellee,

versus

REBECCA NOGA and
FLORIDA LION'S DEN, INC.,

Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Florida

**(March 5, 1999)**

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

The jury in this case found the defendants liable for infringing the plaintiff's copyright in a computer program and for violating section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The district court entered judgment against the defendants, awarding both actual damages and attorneys' fees to the plaintiff.  On appeal, the defendants challenge numerous rulings of the

district court. We affirm. In so doing, we endeavor to bring a small measure of clarity to certain "rather swampy"[1] areas of copyright and unfair competition law.

I.

Plaintiff Robert Montgomery is the author of VPIC, a computer software program that enables users to view pictures on a computer screen. Montgomery integrated several computer programs that he previously had written – each of which was capable of reading different picture file formats – to create the initial version of VPIC in December 1988. VPIC went through several versions during the course of its development, including version 1.3, released on February 2, 1989, and version 1.4, released on March 15, 1989. Montgomery did not register his copyrights in the early versions of VPIC and did not affix a copyright notice when he marketed these early versions on computer bulletin boards. On August 8, 1990, Montgomery registered his copyright in VPIC version 2.9a. VPIC 2.9a and subsequent versions did contain a copyright notice when Montgomery marketed them on computer bulletin board systems.[2]

The defendants, Florida Lion's Den, Inc. ("FLD") and Rebecca L. Noga (FLD's president and sole shareholder), produce CD-ROM discs that are largely pornographic in nature.

---

[1] Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 839 (11th Cir. 1983) (quoting B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1258 (5th Cir. 1971)).

[2] As Montgomery's complaint explains, a bulletin board system (or BBS) is an electronic interface between two computer systems that allows users to download software onto their computer systems. VPIC 2.9a and subsequent versions included a notice of Montgomery's copyright as well as information about how users that obtained VPIC from bulletin boards could register with Montgomery to avoid copyright infringement liability. Software that is marketed in this way is called "shareware."

In 1992, the defendants and FLD vice-president Blaine Richard downloaded VPIC version 4.3[3] from a bulletin board and incorporated it as a utility on four of FLD's CD-ROM titles without obtaining a license from Montgomery. Because the defendants had activated a certain feature of VPIC, the VPIC closing screen that contained Montgomery's copyright notice did not appear when users viewed the pictures on the defendants' discs.

Upon learning of the defendants' unauthorized use of VPIC, Montgomery – acting through his licensing agent, who sent a letter to the defendants on June 3, 1993 – demanded that the defendants cease and desist from using VPIC on FLD products, recall all unsold products containing VPIC, and pay damages for their unauthorized use. The defendants did not comply with these demands; Montgomery therefore filed a complaint against them in the U.S. District Court for the Middle District of Florida on October 25, 1993. The complaint sought damages and injunctive relief for infringement of Montgomery's VPIC copyright in violation of 17 U.S.C. § 101 et seq., and for a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[4] The defendants raised a number of affirmative defenses and impleaded Richard as a third-party defendant. Montgomery obtained a preliminary injunction on November 30, 1993, that enjoined the defendants from utilizing VPIC in FLD products.[5]

---

[3] Montgomery registered his copyright in VPIC 2.9a in 1990. The defendants sold the four CD-ROM titles incorporating VPIC 4.3 from approximately December 1992 through October 1993. At the time that the defendants incorporated VPIC 4.3 onto their CD-ROM discs, VPIC 4.3 was not the most current version of VPIC available. Montgomery did not register his copyright in VPIC version 4.3 until January 24, 1995, well after he commenced this suit.

[4] The complaint also alleged that the defendants' actions constituted unfair competition under Florida common law. The district court dismissed this claim on April 7, 1994, on the ground that it was pre-empted by the Copyright Act.

[5] The injunction also required the defendants to recall and surrender to Montgomery all infringing FLD products in their possession, and to advertise via bulletin board that the

2

Both Montgomery and the defendants moved for summary judgment on Montgomery's two claims, but the district court denied these motions on January 24, 1995. The case went to trial before a jury on March 20, 1995. At the close of Montgomery's case in chief, the defendants moved for judgment as a matter of law on both claims; the court denied their motion. At the close of all the evidence, Montgomery moved for judgment as a matter of law and the defendants renewed their motion; the court denied these motions as well. The case was then submitted to the jury, which found in favor of Montgomery on both claims and awarded actual damages in the amount of $80,000 for the copyright infringement claim and $30 for the Lanham Act claim.[6] The jury also found that, with regard to the copyright claim, the defendants' infringement had been "willful" and that, with regard to the Lanham Act claim, the case was "exceptional."

The district court subsequently entertained several post-trial motions. The court denied the defendants' motion for remittitur or a new trial, as well as their renewed motion for judgment as a matter of law.[7] The court granted Montgomery's motion for a permanent injunction and, in light of the jury's "willful" and "exceptional" findings, granted Montgomery's motion for costs and attorneys' fees. Montgomery also moved for an award of statutory damages pursuant to 17 U.S.C. § 504(c)(1), but the district court declined to award additional damages. Judgment was

---

infringing products were produced without a license and thus were subject to payment of a licensing fee to Montgomery.

[6] The jury had been instructed that Montgomery could not be awarded a double recovery of the same damages under both the copyright and Lanham Act claims.

[7] The court granted the defendants' motion for judgment against third-party defendant Richard, noting that Richard previously had admitted that the defendants had a right of complete contribution and indemnification against him for any amount that the defendants were found to owe Montgomery in this suit.

3

therefore entered in favor of Montgomery and against the defendants in the amount of $228,833.34: $80,000 for the copyright claim, $30 for the Lanham Act claim, $142,289.26 for attorneys' fees, and $6,514.08 for costs.[8] This appeal followed.[9]

## II.

The defendants contend that the district court erred in (A) denying their motion for judgment as a matter of law on the copyright infringement claim given that (1) Montgomery's copyright in VPIC 2.9a is invalid because earlier versions of VPIC were injected into the public domain, and (2) the scope of Montgomery's registered copyright in VPIC 2.9a, even if valid, does not extend to protect VPIC 4.3; (B) denying their motion for remittitur or a new trial on the issue of damages with respect to the copyright claim; (C) denying their motion for judgment as a matter of law on the Lanham Act claim; (D) precluding one of their witnesses from testifying as an expert; and (E) awarding Montgomery attorneys' fees on (1) the copyright claim and (2) the Lanham Act claim. We address these contentions seriatim.

## A.

In evaluating the defendants' contention that the district court improperly denied their motion for judgment as a matter of law on Montgomery's copyright infringement claim, we proceed from certain basic principles of copyright law. The Copyright Act of 1976, 17 U.S.C. §

---

[8] The court also entered judgment in favor of the defendants against Richard in this amount.

[9] We have subject matter jurisdiction over this appeal. See 15 U.S.C. § 1121(a) (1994); 28 U.S.C. §§ 1291, 1338 (1994).

101 et seq. (1994), provides protection for computer programs.  See Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 842 (11th Cir. 1990); 17 U.S.C. § 102(a) (1994).  The Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101 (1994).  For original computer programs and other original works of authorship created after 1977, copyright automatically inheres in the work at the moment it is created without regard to whether it is ever registered.  See Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529, 1531 (11th Cir. 1994); 17 U.S.C. § 102(a); Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 7.16[A][1] (1998) [hereinafter Nimmer].  In order to bring an action for copyright infringement, however, the author must first register the copyright.  See 17 U.S.C. §§ 411(a), 501(b) (1994); M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1488 & n.4 (11th Cir. 1990) (stating that "[t]he registration requirement is a jurisdictional prerequisite to an infringement suit").  Montgomery's claim of copyright infringement, therefore, necessarily is predicated on the defendants' infringement of VPIC 2.9a – the only version of VPIC that Montgomery had registered at the time he commenced this action.

Once a copyright infringement action has been properly commenced, the copyright holder must prove two elements in order to prevail:  "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991).  Here, the element of copying is not in dispute.  The defendants admit that, without obtaining a license from Montgomery, they downloaded VPIC 4.3 from a bulletin board and incorporated it as a utility on four FLD discs.

5

The defendants challenge the propriety of Montgomery's copyright infringement claim on two grounds. First, they argue that Montgomery does not own a valid copyright in VPIC 2.9a as required by Feist. According to the defendants, Montgomery's copyright in VPIC 2.9a is invalid because earlier versions of VPIC – components of which were contained in VPIC 2.9a – were injected into the public domain. Second, and alternatively, the defendants argue that the scope of Montgomery's copyright registration for VPIC 2.9a does not extend to support the commencement of an action for infringement of his unregistered copyright in VPIC 4.3 – the version that the defendants incorporated.

The district court rejected these arguments, finding that the jury's verdict was in accordance with both the law and the evidence at trial. We review a district court's denial of a motion for judgment as a matter of law de novo, applying the same standards as the district court. In considering the sufficiency of the evidence that supports the jury's verdict, we review the evidence "in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." Walker v. NationsBank of Fla., N.A., 53 F.3d 1548, 1555 (11th Cir. 1995). If reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied. See Walls v. Button Gwinnett Bancorp, Inc., 1 F.3d 1198, 1200 (11th Cir. 1993). Questions of law raised by the motion, however, are reviewed de novo. See Morro v. City of Birmingham, 117 F.3d 508, 513 (11th Cir. 1997), cert. denied, — U.S. —, 118 S. Ct. 1299, 140 L. Ed. 2d 465 (1998). Applying these standards to the two arguments presented by the defendants, we conclude that the district court correctly denied their motion.

6

1.

The plaintiff in a copyright infringement action normally bears the burden of proving ownership of a valid copyright.  In order to meet this burden, the plaintiff must show that the work is original and that the applicable statutory formalities were followed.  See Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir. 1996).  Given that Montgomery produced a certificate of copyright registration for VPIC 2.9a at trial, however, he benefited from a rebuttable presumption that the VPIC 2.9a copyright is valid.  See 17 U.S.C. § 410(c) (1994).[10] The burden therefore shifted to the defendants, who were required to demonstrate that "the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection." Bateman, 79 F.3d at 1541.

The defendants' argument that VPIC 2.9a is unprotectable has two parts.  Citing 17 U.S.C. § 405(a), the defendants initially claim that VPIC 1.3 and its predecessor versions were injected into the public domain – i.e., that Montgomery forfeited his unregistered copyrights in these versions – because these versions did not contain copyright notices when Montgomery released them to the public prior to March 1, 1989.  Second, the defendants assert that the

_____

[10] Section 410(c) states that, in any judicial proceeding, "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright . . . ."  The defendants argue that Montgomery could not benefit from this presumption because he released some of VPIC's predecessor programs prior to October 1988, over five years before he brought this suit.  This argument misinterprets the statute.  Section 410(c) merely requires that the work at issue be registered (not that the infringement suit be brought) within five years after its first publication.  The evidence at trial demonstrated that VPIC 2.9a was first released to the public on July 1, 1990, and that Montgomery registered his copyright in that version on August 8, 1990.  Accordingly, Montgomery was entitled to the section 410(c) presumption.

7

revisions Montgomery made to VPIC in versions 1.4 through 2.9a were not sufficiently original to support a valid copyright in version 2.9a.

We find that the defendants have not met their burden. Assuming arguendo that Montgomery forfeited his copyrights in VPIC 1.3 and its predecessors by publishing them without a copyright notice,[11] we conclude that the modifications Montgomery made to VPIC in versions 1.4 through 2.9a were sufficiently original to support a valid copyright in version 2.9a as a derivative work. See SAS Inst., Inc. v. S&H Computer Sys., Inc., 605 F. Supp. 816, 826-27 (M.D. Tenn. 1985) (concluding that regardless of whether previous version of computer programming system was in the public domain, subsequent version of system was sufficiently original to support valid copyright).

---

[11] 17 U.S.C. § 405(a) (1994) states that, for works publicly distributed before March 1, 1989,

> the omission of [a copyright notice] from copies or phonorecords . . . does not invalidate the copyright in a work if . . . (2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered . . . .

See generally Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc., 785 F.2d 897, 905-06, 910-12 (11th Cir. 1986); 2 Nimmer § 7.16[A][1].

Montgomery argues that his 1990 registration of, and inclusion of a copyright notice in, VPIC 2.9a occurred less than 5 years after the publication of VPIC 1.3 and its predecessors in the late 1980s. He concludes, therefore, that any potential forfeiture of his rights properly was cured under section 405(a)(2). Montgomery's conclusion might be correct if he had registered, and made a reasonable effort to add notice to subsequent copies of, VPIC version 1.3 and its predecessor versions themselves. Cf. Continental Homes, 785 F.2d at 911 n.22 (discussing a disagreement among various courts regarding whether section 405(a)(2) requires a copyright owner to add notice to all copies distributed, or only to copies distributed after it is discovered that notice was omitted). We express no opinion, however, on the question of whether the inclusion of a copyright notice in copies of a subsequent version of a work can rescue the copyright of a previous version that was distributed without a copyright notice. Cf. 17 U.S.C. § 101 (1994) ("where the work has been prepared in different versions, each version constitutes a separate work").

The Copyright Act states that "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications [to a preexisting work that], as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. Such a work – if it is non-infringing and sufficiently original – qualifies for a separate copyright, although this copyright does not protect the preexisting material employed in the derivative work. See 17 U.S.C. § 103 (1994); Stewart v. Abend, 495 U.S. 207, 223-24, 110 S. Ct. 1750, 1761-62, 109 L. Ed. 2d 184 (1990); 1 Nimmer §§ 3.01, 3.04[A]. In this case, the requirement of non-infringement clearly is satisfied. This is true regardless of whether Montgomery held valid copyrights in VPIC 1.3 and its predecessor versions when he modified them to create version 2.9a (as Montgomery maintains) or he merely took VPIC 1.3 and its predecessor versions from the public domain and modified them in order to create version 2.9a (as the defendants maintain).

With regard to the requirement of originality, all that must be shown is that the work "possesses at least some minimal degree of creativity. . . . To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." Feist, 499 U.S. at 345, 111 S. Ct. at 1287; see also id. at 348, 111 S. Ct. at 1289.[12] The defendants claim that the modifications Montgomery made to VPIC in versions 1.4 through 2.9a did not cross even this low threshold. In support of this claim, they argue that Montgomery himself stated on cross-examination that

_____

[12] Feist resolved a possible tension in our precedent regarding the test for establishing originality. Compare Sherry Mfg. Co. v. Towel King of Fla., Inc., 753 F.2d 1565, 1568 (11th Cir. 1985) (noting that "in order to qualify for a separate copyright, the derivative work must contain some substantial, and not merely trivial, originality" (emphasis added)), with Original Appalachian Artworks, Inc. v. The Toy Loft, Inc., 684 F.2d 821, 824-25 (11th Cir. 1982) (discussing the "minimal degree of originality necessary for copyright protection" (emphasis added)). Cf. 1 Nimmer § 3.03, at 3-10 ("[I]n order to qualify for a separate copyright as a derivative or collective work, the additional matter injected in a prior work . . . must constitute more than a minimal contribution.").

9

the source code for VPIC version 2.9a was substantially similar to the source code for version

1.3. We find that the import of Montgomery's statement is far from clear.[13] It is clear from other

evidence presented at trial, however, that VPIC 2.9a contained several additions and corrections

that were not present in version 1.3. For example, the revision history that was submitted with

---

[13] The statement at issue occurred after a series of questions by the defendants' counsel that sought to have Montgomery compare versions 1.3 and 2.9a. Counsel began by asking Montgomery about the size of the execute file (in bytes) for each of these versions, and then by asking him to compare the size of these files in percentage terms. Counsel then turned to the source code for each version and asked what would be the best way to compare the code. This exchange followed:

      A. There probably is no good way to do it. You may have added comments, you may have taken comments out. There's [sic] comments that don't compile. Even if you look at the size of the C modules and things like that, it still wouldn't tell you. . . .

      Q. If we had the source code of VPIC version 1.3, couldn't we at least see some very similar [sic]?

      A. You'd see portions of it in there, yes. The menu system was in there.

      Q. You might even see 80 or 90 percent, possibly; isn't that correct?

      A. You might. Might not. . . . How can you possibly tell? You know, I don't, I don't understand how you can tell. How you can get a comparison of 90 percent, 80 percent, 70 percent, 100 percent, you know. <u>It may be 100 percent with different words. I mean, you know, that's a possibility</u>. I don't know how you, how you can get percentages.

(emphasis added).

Defendants claim that the portion of Montgomery's answer emphasized above establishes that the material added in versions 1.4 through 2.9a was not sufficiently original to support a valid copyright in version 2.9a. It is not clear from this exchange, however, whether Montgomery's comments regarding percentages pertained to the size of the code for these two versions or to the similarity of the code. The following exchange, which occurred shortly after the one quoted above, suggests that the code for version 2.9a was not 100 percent similar to the code for version 1.3:

      Q. . . . [I]n 1.3, you pretty well have 80 or 90 percent of VPIC 2.9a . . . as far as what it does?

      A. . . . I think by the time it got to 2.9, it knew how to do a bunch of other things. . . .

      Q. By the time you got to 2.9, you also corrected a number of errors, did you not?

      A. Yes. Yes. It mainly amounts to adding new features.

10

the VPIC 2.9a copyright registration application shows that in versions 1.4 through 2.9a, Montgomery corrected many problems, increased the number of graphics file formats that VPIC users could view, increased by 50 percent the speed at which VPIC would decode graphics stored in the GIF file format, and configured VPIC to work with additional graphics computer chips and cards. In light of this evidence, we conclude that the defendants failed to meet their burden of showing that the modifications Montgomery made to VPIC in versions 1.4 through 2.9a were not sufficiently original to support a valid copyright in version 2.9a as a derivative work. The district court, therefore, did not clearly err in rejecting the defendants' argument that VPIC 2.9a is unprotectable.[14]

---

[14] While the question of originality usually is viewed as an issue of fact subject to appellate review under the clearly erroneous standard, see Original Appalachian Artworks, 684 F.2d at 825; 3 Nimmer § 12.12, we have departed from this standard in certain situations. In Sherry Manufacturing, 753 F.2d at 1569 & n.6, we held as a matter of law that a design on a towel lacked sufficient originality to be copyrightable. In so doing, we stated that "where the appellate court has the opportunity to view for itself the same tangible exhibits considered by the trial court, the rationale for applying the clearly erroneous standard disappears." Id. at 1569 n.6. We cited the Second Circuit case of Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 35 (2d Cir. 1982), in support of this statement.

In this case, we have before us certain tangible exhibits that bear directly on the question of whether Montgomery's modifications were sufficiently original. Some of these exhibits, such as the source code for VPIC 2.9a, are not readily comprehensible by those not trained in computer programming. The VPIC revision history is somewhat more comprehensible, but Montgomery interpreted and expanded upon it at length in his trial testimony. In such circumstances, it is unclear whether Sherry Manufacturing would require that we consider the question of originality de novo. Cf. Malden Mills, Inc. v. Regency Mills, Inc., 626 F.2d 1112, 1113 & n.2 (2d Cir. 1980) (implying, in the context of a copyright infringement analysis, that expert testimony regarding matters not within the knowledge of the lay observer might preclude de novo review); G.R. Leonard & Co. v. Stack, 386 F.2d 38, 40-41 (7th Cir. 1967) (applying the clearly erroneous standard in the copyright infringement context where the evidence regarding the parties' respective works consisted mostly of "testimonial analysis and interpretation" of the works). To the extent that Sherry Manufacturing would require de novo review, however, we conclude that Supreme Court precedent prevents us from following it.

Only twenty days after we decided Sherry Manufacturing, the Supreme Court held that factual findings are to be reviewed for clear error "even when the district court's findings do not

11

2.

We now turn to the defendants' alternative argument that the scope of Montgomery's

copyright registration in VPIC 2.9a does not extend to support the commencement of an action

for infringement of his unregistered copyright in the derivative work VPIC 4.3.[15]  The defendants

base this argument on several provisions of the Copyright Act.  First, they point to the following

clause from the Act's discussion of when a work is "created":  "[W]here the work has been

prepared in different versions, each version constitutes a separate work."  17 U.S.C. § 101.  The

defendants also direct our attention to 17 U.S.C. § 411(a) (1994), which states that "no action for

infringement of the copyright in any work shall be instituted until registration of the copyright

claim has been made in accordance with this title."  Reading these provisions together, the

rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."  Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511-12, 84 L. Ed. 2d 518 (1985).  While we recognize that Second Circuit copyright infringement cases continue to apply de novo review to certain factual determinations that are based on tangible exhibits, see, e.g., Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 766 (2d Cir. 1991) (reviewing district court finding of substantial similarity de novo); Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 402-03 (same), we believe that this standard of review is inappropriate after Anderson.  See Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 506-07 & n.1 (7th Cir. 1994); cf. AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1541 n.46 (11th Cir. 1986) (citing Anderson and declining to review de novo a finding of similarity of design in trade dress infringement action brought under Lanham Act section 43(a)).

[15] In his brief, Montgomery characterizes VPIC 4.3 as a derivative work of VPIC 2.9a.  If this characterization is accurate, VPIC 4.3 would have qualified for a separate copyright at the moment of its creation.  See 17 U.S.C. §§ 102(a), 103 (1994).  Although the defendants do not contend that the modifications Montgomery made to VPIC 2.9a in order to create VPIC 4.3 were insufficiently original to warrant characterizing VPIC 4.3 as a derivative work, the evidence in the record regarding the nature of these modifications is sparse.  We assume for purposes of the above discussion that VPIC 4.3 is a derivative work, but it is important to note that our conclusion would be the same even if VPIC 4.3 did not possess sufficient originality to be characterized as a derivative work.

12

defendants conclude that because VPIC version 4.3 is a "separate work" that was not registered when Montgomery brought this suit, Montgomery could not maintain a copyright infringement action against them for copying that work. While the defendants recognize that Montgomery registered his copyright in VPIC 2.9a, they claim that the Copyright Act[16] supports the conclusion that this registration does not cover material – such as the derivative work VPIC 4.3 – not in existence at the time of the registration.

The defendants' argument, however, mischaracterizes Montgomery's claim of copyright infringement. The evidence at trial showed that VPIC 4.3 incorporated over seventy percent of the original source code from the registered work VPIC 2.9a, and that VPIC 4.3 would not function if the VPIC 2.9a code was removed. By downloading VPIC 4.3 and incorporating it as a utility on FLD discs, therefore, the defendants infringed Montgomery's registered copyright in VPIC 2.9a within the meaning of section 501(a) of the Copyright Act. See 17 U.S.C. § 501(a) (1994) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 . . . is an infringer of the copyright . . . ."); 17 U.S.C. § 106(1)-(2) (1994) (noting that a copyright owner has the exclusive right to do and to authorize both reproduction of the copyrighted work in copies and preparation of derivative works based upon the copyrighted work); H.R. Rep. No. 94-1476, at 61 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5675 (noting that under section 106(1), "a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or

---

[16] The defendants argue that the provisions of the Copyright Act cited above, as well as section 103(b) of the Act, support their characterization of the VPIC 2.9a registration. See 17 U.S.C. § 103(b) (1994) (stating that the copyright in a derivative work "is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material").

simulation" (emphasis added)); id. at 62, reprinted in 1976 U.S.C.C.A.N. at 5675 ("The

exclusive right to prepare derivative works, specified separately in clause (2) of section 106,

overlaps the exclusive right of reproduction [in section 106(1)] to some extent. . . . [T]o

constitute a violation of section 106(2), the infringing work must incorporate a portion of the

copyrighted work in some form." (emphasis added)). Such infringement is actionable under

sections 501(b) and 411(a) of the Act.[17] See 17 U.S.C. § 501(b) (1994) ("The legal or beneficial

owner of an exclusive right under a copyright is entitled, subject to the requirements of section

411, to institute an action for any infringement of that particular right committed while he or she

is the owner of it."); 17 U.S.C. § 411(a) (1994); see also Lamb v. Starks, 949 F. Supp. 753, 755-

56 (N.D. Cal. 1996) (holding that a prima facie case of copyright infringement had been

established where the defendant copied plaintiff's unregistered trailer that contained portions of

---

[17] The authorities cited in the text directly support our conclusion. Additional support may be found in the pronouncements of courts and commentators that have dealt with analogous factual situations. See, e.g., Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1111-12 (1st Cir. 1993) (holding that plaintiff could recover damages for copyright infringement of underlying work where plaintiff had an exclusive license to distribute an underlying work that was subject to a registered copyright, plaintiff had produced an unregistered derivative work based on the underlying work, and defendant had copied and distributed the derivative work); id. at 1112 ("Although a derivative work may be separately copyrighted, that copyright does not affect the copyright in the underlying work. . . . Any elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work."); cf. Stewart v. Abend, 495 U.S. 207, 223, 110 S. Ct. 1750, 1761, 109 L. Ed. 2d 184 (1990) ("The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work."). See also 1 Nimmer § 3.05, at 3-34.20 (considering whether the owner of the registered copyright in an underlying work may claim infringement when the defendant has copied matter that originated in the underlying work from a derivative work produced by a third party under a nonexclusive license, and concluding that "the better view is that if the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work, or indirectly via the derivative work").

14

a movie in which the plaintiff held a registered copyright); <u>Central Point Software, Inc. v. Nugent</u>, 903 F. Supp. 1057, 1060 & n.5 (E.D. Tex. 1995) (granting summary judgment on plaintiffs' copyright infringement claim where plaintiffs registered their copyrights in certain versions of computer programs and defendants copied subsequent versions that were derived from the registered works); 2 <u>Nimmer</u> § 7.16[B][2] (concluding that the owner of a registered underlying work that is part of an unregistered derivative work should be able to maintain a copyright infringement suit against a defendant who reproduces the derivative work – and thus the underlying work contained therein – without authorization); Douglas Y'Barbo, <u>On Section 411 of the Copyright Code and Determining the Proper Scope of a Copyright Registration</u>, 34 San Diego L. Rev. 343, 351-52, 354 n.38, 356 (1997) (same).

We conclude, after considering this question of law <u>de novo</u>, that the district court did not err in rejecting the defendants' argument that the scope of Montgomery's registered copyright in VPIC 2.9a does not extend to protect VPIC 4.3. We therefore affirm the district court's decision to deny the defendants' motion for judgment as a matter of law.


B.

The defendants' next claim of error relates to their motion for remittitur or – if Montgomery rejected a remittitur amount proposed by the court – for a new trial on the issue of damages with respect to Montgomery's copyright claim. In this motion, the defendants contended that the jury's award of $80,000 in damages for copyright infringement – $43,900 for actual damages sustained by Montgomery as a result of the infringement and $36,100 for the defendants' profits attributable to the infringement – was excessive and not supported by the

15

evidence because the award was based on the value of unregistered VPIC versions issued subsequent to the registered version 2.9a. The defendants maintained that no evidence was introduced at trial regarding the value of VPIC 2.9a at the time of the infringement, and that there was no evidence that anyone had ever purchased a license from Montgomery to use VPIC 2.9a. The district court denied the motion, concluding that the verdict was in accordance with the jury instructions and the evidence presented at trial.

Although the defendants' briefs on appeal are somewhat opaque, the defendants apparently contend that the district court erred in two ways when it denied their motion. First, they claim that the court committed an error of law by failing to instruct the jury to base its calculation of actual damages on the reasonable value in the marketplace of the plaintiff's program VPIC 2.9a for commercial use at the time of the infringement. When the defendants' counsel suggested this instruction during the charge conference, the court expressed the view that it would be error to rule that the plaintiff could recover infringement damages only for VPIC 2.9a. Such a ruling, explained the court, would "foreclose the derivative work concept." Instead, the court merely instructed the jury to consider the reasonable value in the marketplace of the "plaintiff's program" for commercial use at the time of the infringement. The defendants' counsel did not object to the district court's version of the actual damages instruction as required by Fed. R. Civ. P. 51. See Electro Servs., Inc. v. Exide Corp., 847 F.2d 1524, 1528-29 (11th Cir. 1988) (concluding that a party who offers a proposed instruction does not thereby preserve a challenge to the giving of a different instruction by the court, absent a specific objection). We

16

therefore review the instruction only for plain error.[18]  See Pate v. Seaboard R.R., Inc., 819 F.2d 1074, 1082-83 (11th Cir. 1987).

When reviewing a jury instruction under the plain error standard, we will reverse "only in exceptional cases where the error is 'so fundamental as to result in a miscarriage of justice.'" Iervolino v. Delta Air Lines, Inc., 796 F.2d 1408, 1414 (11th Cir. 1986) (quoting Delancey v. Motichek Towing Serv., Inc., 427 F.2d 897, 901) (5th Cir. 1970)).  More specifically, we require appellants to establish "that the challenged instruction was an incorrect statement of the law and that it was probably responsible for an incorrect verdict, leading to substantial injustice."  Pate, 819 F.2d at 1083.  If the instruction will "'mislead the jury or leave the jury to speculate as to an essential point of law,' the error is sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection."  Id. (quoting Cruthirds v. RCI, Inc., 624 F.2d 632, 636 (5th Cir. 1980)).

Applying this standard to the challenged instruction on the calculation of actual damages, we conclude that the defendants have not established that the instruction was fundamentally erroneous.  The relevant provision of the Copyright Act states that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement . . . ."  17 U.S.C. § 504(b) (1994).  This provision requires the plaintiff to demonstrate a "causal

---

[18] In their brief on appeal, the defendants suggest that, prior to the charge conference, the district court had already heard and rejected their argument that damages should be based on version 2.9a.  We have recognized an exception to the objection requirement of Rule 51 where "the party's position has previously been made clear to the court and it is plain that a further objection would have been unavailing."  Pate, 819 F.2d at 1082 (quoting Lang v. Texas & Pac. R.R. Co., 624 F.2d 1275, 1279 (5th Cir. 1980)).  After reviewing the record, we are not convinced that it was "plain" at the charge conference that an objection by the defendants would have been unavailing.

17

connection" between the defendant's infringement and an injury to the market value of the plaintiff's copyrighted work at the time of infringement.[19]  See Key West Hand Print Fabrics, Inc. v. Serbin, Inc., 269 F. Supp. 605, 613 (S.D. Fla. 1966); 4 Nimmer § 14.02[A]; see also Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170-71 (1st Cir. 1994) (defining the plaintiff's burden with reference to tort law principles of causation and damages).  Having held that the defendants infringed Montgomery's registered copyright in VPIC 2.9a by placing VPIC 4.3 on FLD discs, see supra part II.A.2., it follows that the jury properly could consider evidence of the injury that the defendants' infringement caused to the value of subsequent unregistered VPIC versions derived from version 2.9a – such as VPIC 4.3 – in order to determine the extent of the injury to the value of Montgomery's registered copyright at the time of infringement.  Cf. 4 Nimmer § 14.02[A], at 14-8 n.4 (noting that, in view of the copyright owner's exclusive right to prepare derivative works under 17 U.S.C. § 106(2), the injury to the market value of the copyrighted work includes any injury to the value of "sequel rights").  Obviously, Montgomery's damages could not adequately be measured solely by reference to the market value of VPIC 2.9a as a stand-alone computer program; this value presumably was quite low at the time of the infringement given that revised versions of the program were then available.  Therefore, the district court did not commit a fundamental error by refusing to instruct the jury to calculate actual damages based only on the value of version 2.9a of the plaintiff's program.

---

[19] This injury often is measured by the revenue that the plaintiff lost as a result of the infringement.  See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 567, 105 S. Ct. 2218, 2234, 85 L. Ed. 2d 588 (1985); Data Gen. Corp., 36 F.3d at 1170; 4 Nimmer § 14.02[A], at 14-9.

The defendants' second claim of error relates to the evidentiary basis for the jury's damage award. The defendants point out that versions 2.9a and 4.3 of VPIC contained a statement that those who wished to use VPIC as a utility for another product had to obtain a license from Montgomery and pay a royalty of $1 per copy of the product shipped. Because the evidence established that FLD and an associated company distributed 26,641 discs containing VPIC, the defendants contend that Montgomery should have received at most $26,641 in damages. Indeed, given that Montgomery sold licenses for unlimited use of a subsequent version of VPIC – version 5.1e – to various entities for $2,000, the defendants contend that the damages awarded should have been no higher than $8,000 for the four CD-ROM titles produced by FLD that incorporated VPIC. The defendants therefore argue that the jury's award of $80,000 in damages was both excessive and unsupported by the evidence.

Because motions for a new trial are committed to the discretion of the trial court, we review the district court's rejection of the defendants' argument only to ascertain whether there has been a clear abuse of discretion. See Agro Air Assocs., Inc. v. Houston Cas. Co., 128 F.3d 1452, 1455 n.5 (11th Cir. 1997) (reviewing denial of motion for remittitur or new trial on ground of excessive damages under abuse of discretion standard); United States v. Sullivan, 1 F.3d 1191, 1196 (11th Cir. 1993) (reviewing denial of motion for new trial on ground that verdict was against the great weight of the evidence under abuse of discretion standard). We have found that "[t]his level of deference is especially appropriate where a new trial is denied and the jury's determinations are left undisturbed." Insurance Co. of N. Am. v. Valente, 933 F.2d 921, 925 (11th Cir. 1991). After reviewing the entire record in light of this standard, we find that there was ample evidence from which the jury could have concluded that an award of $43,900 for

19

actual damages resulting from the infringement and $36,100 for the defendants' profits attributable to the infringement was appropriate.

As to Montgomery's actual damages, the evidence indicated that VPIC 4.3 was not the most current version of VPIC available at the time that FLD produced its four CD-ROM titles. At that time, a license to use the most current version of VPIC as a utility for another product could be obtained in exchange for a royalty of $2 to $3 per copy of the product shipped.[20] Montgomery testified at trial that he typically only licensed the most current version of VPIC available.[21] The jury was thus entitled to conclude that the defendants would have had to pay Montgomery at least $53,282 for a license to distribute the 26,641 FLD CD-ROM discs that incorporated VPIC – an amount in excess of the $43,900 that the jury actually awarded. While the defendants correctly note that Montgomery sold $2,000 unlimited use licenses for VPIC 5.1e, the jury certainly was permitted to find that Montgomery would not have offered such a license to the defendants. See Iowa State Univ. Research Found., Inc. v. American Broad. Cos., 475 F. Supp. 78, 83 (S.D.N.Y. 1979) (noting, in the context of awarding statutory damages under the

---

[20] VPIC 5.0b was the most current version available at the time that FLD produced its first CD-ROM title; Montgomery testified that he charged a royalty of $2 per copy at this time. On December 20, 1992, Montgomery raised the royalty to $3 per copy beginning with VPIC 6.0. Montgomery argues on appeal that FLD produced its three remaining CD-ROM titles after this royalty increase. While the testimony at trial was somewhat unclear on this point, the pressing dates that are encoded within the CD-ROM exhibits themselves seem to indicate that FLD produced only one of its CD-ROM titles after December 20, 1992.

[21] As mentioned in note 20, supra, Montgomery increased his royalty rate to $3 beginning with VPIC 6.0. At trial, however, the evidence indicated that Montgomery subsequently issued some licenses for older versions of VPIC – versions 5.1 and 5.1e – at a rate of either $2 per copy or $2,000 for unlimited usage. Montgomery testified that he issued these licenses either because the user did not plan to distribute VPIC to the public or because the user planned only limited public distribution (often less than 1,000 copies) and could not afford the $3 per copy royalty.

Copyright Act of 1909, that the defendant "cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law"); 4 Nimmer § 14.02[A] (applying this observation from Iowa State to the computation of actual damages under the current Copyright Act).

With respect to the defendants' profits, the Copyright Act provides the following computational guidance:

> The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b) (1994). Montgomery provided evidence at trial, however, that went well beyond his statutory obligation to present proof of the defendants' gross revenue. Montgomery initially provided a set of spreadsheets that summarized various business records of FLD produced by the defendants. These spreadsheets showed that FLD's total revenue from sales of the four CD-ROM titles at issue was $255,162, and that FLD's total profit (after expenses) on these sales was $142,802.80. Later in the trial, Montgomery provided an alternative FLD total profit estimate of $158,103 that was based upon profit information elicited from Noga on cross-examination. By determining what percentage of files on each CD-ROM title could be viewed using VPIC, Montgomery estimated that the amount of this profit allocable to VPIC was $107,310.35. While the defendants did seek to discredit Montgomery's profit allocation estimate on cross-examination, they did not question Montgomery's total profit figures and did not offer any allocation estimate of their own. The jury, faced with multiple profit estimates of over $100,000, thus had a sufficient evidentiary basis for its conclusion that Montgomery should

21

recover $36,100 as the defendants' profits attributable to the infringement.[22]  The district court, therefore, did not clearly abuse its discretion in denying the defendants' motion for remittitur or a new trial on the issue of damages.

C.

Turning to Montgomery's claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A),[23] the defendants contend that the district court committed several errors when it denied their motion for judgment as a matter of law.  Three of the defendants' claims of error merit discussion here.[24]  We consider these claims in light of the standards enunciated in the

_____

[22] As noted above, 17 U.S.C. § 504(b) (1994) allows recovery of a defendant's profits only if such profits "are not taken into account in computing the actual damages."  There is no indication that the jury's award of damages violated this prohibition of double recovery.  As one commentator has noted, "[e]ven when a plaintiff's actual damages include lost profits, there may be a recovery of defendant's profits in an amount equal to (but not more than) the amount by which defendant's profits exceed plaintiff's lost profits."  4 Nimmer § 14.03, at 14-30.  In this case, the jury's award of $43,900 in actual damages arguably represents the profits that Montgomery lost because of the defendants' failure to purchase a license to distribute VPIC.  Because Montgomery's $107,310.35 estimate of the defendants' profit allocable to VPIC exceeded this actual damage award by $63,410.35, however, the jury's award of $36,100 as the defendants' profits was permissible.

[23] Section 43(a), as amended, provides in pertinent part:
(1) Any person who, on or in connection with any goods . . ., uses in commerce any word, term, name, symbol, or device, . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a) (1994).

[24] The three claims of error that we discuss above are not the only purported errors that the defendants identify on appeal.  They also argue, for example, that Montgomery's Lanham Act claim must fail because Montgomery never registered VPIC as a trademark.  It is well

22

introduction to part II.A., supra, and conclude that the district court did not err in denying the defendants' motion.

1.

The defendants first contend that the district court was required, as a matter of law, to grant their motion because the act of omitting a copyright notice alone cannot constitute a violation of section 43(a). They argue that if such an omission was found to be actionable under section 43(a), virtually every act of copyright infringement would also constitute a violation of the Lanham Act. This argument, however, mischaracterizes the facts of the case before us. While the defendants did activate a certain feature of VPIC that caused Montgomery's copyright notice not to appear when users viewed FLD's CD-ROM discs, this was not the only act upon which the defendants' liability under section 43(a) could have been predicated. Unchallenged testimony at trial established that each of FLD's four CD-ROM titles that contained VPIC, when loaded into a computer and used, would display a CD help menu in which FLD claimed copyright. The copyright notice on one CD-ROM title, for example, stated that the help menu was "copyrighted and owned" by FLD. As part of the help menu on each title, the defendants included a description of how a user with a particular brand of computer video card could set up a viewing program in order to display the picture files that were present on the disc. One such

_____

settled, however, that registration is not a prerequisite to an action under section 43(a). See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 2757, 120 L. Ed. 2d 615 (1992). As to the defendants' other claims of error, we decline to consider them here because they were not raised before the district court. See Caban-Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir. 1996); All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1538 n.3 (11th Cir. 1989).

23

description read, in pertinent part: "Included on this CD-ROM [disc] are two different [picture file] viewing utilities, VPIC and CSHOW, each in its own directory. VPIC is the best one to use . . . ." This description was not the only reference to VPIC that appeared on the defendants' CD-ROM titles; the names of several files present on each title also contained the term "VPIC."

In considering whether Montgomery failed as a matter of law to establish a violation of section 43(a) on these facts, we begin with Montgomery's complaint. In Count Two, Montgomery claimed that the defendants had violated section 43(a) in one of two ways: by "pass[ing] off the VPIC software as their own property" or by "represent[ing] a connection, license, association, or relationship between Plaintiff and Defendants." These two theories of liability correspond to two portions of section 43(a), which we will refer to as the "false designation of origin" prong and the "mistaken affiliation" prong.[25] The essence of Montgomery's argument for liability under these two prongs is that the defendants' use of the term "VPIC" as described above would likely confuse users of the CD-ROM discs; such users

_____

[25] See 15 U.S.C. § 1125(a)(1)(A) (1994) (the false designation of origin prong prescribes liability for "[a]ny person who, on or in connection with any goods . . . , uses in commerce any . . . false designation of origin . . . [which] is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person . . . ."); id. (the mistaken affiliation prong prescribes liability for "[a]ny person who, on or in connection with any goods . . . , uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . [which] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person . . . ."); cf. Jerome Gilson, Trademark Protection and Practice § 5.01[3], at 5-26 (39th rel. 1998) (noting that confusion can be likely under section 43(a) on either "a source basis" or "an associational basis").

These two prongs are part of subsection (A) of section 1125(a)(1), which prescribes liability "for infringement of even unregistered marks, names, and trade dress." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:9 (4th ed. 1996). Subsection (B), which is not at issue here, addresses false advertising.

24

would likely believe either that the defendants owned the VPIC viewing utility themselves or

that they had licensed it from its owner for commercial use.  In either case, Montgomery argues,

the users would not know that their use of VPIC was in fact unauthorized and that they needed to

obtain a license from Montgomery for their own non-commercial use of his program in

connection with the defendants' discs.  We agree with Montgomery's argument.  Therefore, we

hold as a matter of law that Montgomery has stated a claim against the defendants under the false

designation of origin and mistaken affiliation prongs of section 43(a) of the Lanham Act.

With respect to the false designation of origin prong, we are mindful of recent Second

Circuit cases that address the question of whether a false copyright notice is actionable under

section 43(a).  In Lipton v. Nature Co., 71 F.3d 464 (2d Cir. 1995), for example, the defendants

infringed the plaintiff's copyright in a book of animal terms by creating a line of merchandise

that utilized the terms.  The merchandise bore copyright notices in the names of both defendants.

The plaintiff brought a claim against the defendants for "reverse passing off"[26] in violation of the

false designation of origin prong of section 43(a).  The district court, concluding that the

copyright notices that the defendants placed on their infringing merchandise constituted false

designations of origin, granted summary judgment for the plaintiff on this claim.  The court of

appeals reversed, "find[ing] that, as a matter of law, a false copyright notice alone cannot

constitute a false designation of origin within the meaning of § 43(a) of the Lanham Act."

Lipton, 71 F.3d at 473; see also Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,

---

[26] See Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1413 n.28 (11th Cir. 1998) ("Section 1125(a) prohibits both 'passing off,' where A sells its product under B's name, and 'reverse passing off,' where A sells B's product under A's name."). We discuss the meaning of "reverse passing off" at greater length in note 27, infra.

25

118 F.3d 955, 971 (2d Cir. 1997), cert. denied, — U.S. —, 118 S. Ct. 1300, 140 L. Ed. 2d 466 (1998) (noting that "[w]ithout a requirement of 'some additional misrepresentation of originality beyond mere use of a copyright symbol, [plaintiffs] could convert all improper copyright claims into Lanham Act violations'" (quoting EFS Mktg., Inc. v. Russ Berrie & Co., 76 F.3d 487, 492 (2d Cir. 1996))). The court attempted to distinguish the leading case of Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982), which imposed liability under section 43(a) on a defendant who placed a copyright notice that read "Copr. Fred Original" on an infringing product, on the ground that the false notice in that case also contained a representation that the product was "original." Lipton, 71 F.3d at 473-74; see also Banff Ltd. v. Express, Inc., 921 F. Supp. 1065, 1072-73 (S.D.N.Y. 1995) (claiming that the Second Circuit's decisions establish that a false representation regarding the creator or originator of a product can be a false designation of origin, but that a false copyright notice cannot).

We do not believe that Lipton forecloses Montgomery's claim under the false designation of origin prong of section 43(a). As an initial matter, we note that many courts have disagreed with Lipton's conclusion that the act of placing a copyright notice on an infringing product cannot be a false designation of origin under section 43(a). See, e.g., Southern Bldg. Code Congress Int'l, Inc. v. Florida Constr. Sch., Inc., 14 U.S.P.Q.2d 1846, 1848 (M.D. Fla. 1989); Manufacturers Techs., Inc. v. Cams, Inc., 706 F. Supp. 984, 1004 (D. Conn. 1989); Sunset Lamp Corp. v. Alsy Corp., 698 F. Supp. 1146, 1153 (S.D.N.Y. 1988); cf. Ladas v. Potpourri Press, Inc., 846 F. Supp. 221, 224 (E.D.N.Y. 1994) (responding to claim that defendant had falsely claimed copyright in giftware collections in violation of section 43(a) by directing defendant to place non-removable stickers bearing plaintiff's copyright notice on collection items). We need

26

not decide whether to adopt the holding of <u>Lipton</u> as the law of this circuit, however, because the facts of this case are distinguishable from <u>Lipton</u>. The CD help menu that referred to VPIC was not merely copyrighted by the defendants; they actually stated that they "owned" the menu. We find that this claim of ownership was sufficient to allow Montgomery to state a claim against the defendants under section 43(a) for false designation of origin.[27] See <u>Lipton</u>, 71 F.3d at 474

---

[27] We recognize that in false designation of origin claims of the "reverse passing off" variety, the defendant often has merely removed the plaintiff's mark from a product, added its own mark, and sold the product without altering it in any other way. In this case, however, the defendants <u>incorporated</u> Montgomery's VPIC product into their own CD-ROM products. It could be argued that, in light of <u>Roho, Inc. v. Marquis</u>, 902 F.2d 356 (5th Cir. 1990), this factual distinction is relevant to our determination of whether Montgomery has stated a claim for false designation of origin.

In <u>Roho</u>, the plaintiff manufactured specialized wheelchair cushions and hospital mattresses. Its mattresses were constructed by assembling four wheelchair cushions together. The defendants bought several of the plaintiff's wheelchair cushions, removed the plaintiff's labels, fastened ten of the cushions together to make a mattress, and attached their own tag to the mattress. The plaintiff sued the defendants for, <u>inter alia</u>, reverse passing off under the false designation of origin prong of section 43(a). <u>See id</u>. at 357-58.

The court began its analysis by noting that the doctrine of reverse passing off is applicable in situations where a defendant resells another person's product that has been only "slightly modified." Finding that the essence of the plaintiff's claim was that the defendant had purchased one of the plaintiff's products and sold it in modified form under a different label, the court proceeded to compare the plaintiff's cushions with the defendants' mattress. It found that the defendants had substantially modified the plaintiff's cushions by attaching them together to create a mattress; furthermore, the mattress and cushions were marketed to different consumers for different purposes. Therefore, the court held that the defendants were not simply reselling a relabeled and slightly modified version of the plaintiff's product. Instead, the defendants' mattress was a new product to which they could properly apply their own label. <u>See id</u>. at 360-61.

We assume <u>arguendo</u> that <u>Roho</u> is applicable in our circuit. <u>See</u> J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 27:81 (4th ed. 1996) (discussing the level of similarity between the defendant's and plaintiff's works that must be demonstrated in order to bring a reverse passing off claim, including the Second Circuit's requirement (which is similar to <u>Roho</u>'s "slightly modified" requirement) of "substantial similarity" and the Ninth Circuit's requirement of "bodily appropriation"); <u>but see</u> <u>Debs v. Meliopoulos</u>, (N.D. Ga. 1991) (rejecting any requirement of either bodily appropriation or substantial similarity and focusing instead on likelihood of confusion). This assumption, however, does not affect our conclusion that

(quoting with approval from <u>Cognotec Servs. Ltd. v. Morgan Guar. Trust Co.</u>, 862 F. Supp. 45, 51 (S.D.N.Y. 1994), which found that copyright infringement alone "does not amount to a . . . false designation to establish a claim under § 43(a)," and noted that such a claim requires the existence of "some affirmative act whereby [the defendant] falsely represented itself as the owner of [the plaintiff's computer program]"); <u>see also</u> <u>Johnson v. Jones</u>, 149 F.3d 494, 503 (6th Cir. 1998) (finding that a defendant who removed the plaintiff's name and seal from a set of architectural plans and substituted his own had "represented [the plans] to be his own work" and was thus liable for false designation of origin); <u>United States Media Corp. v. Edde Entertainment Inc.</u>, 40 U.S.P.Q.2d 1581, 1588 (S.D.N.Y. 1996) (noting that although a copyright notice is insufficient under <u>Lipton</u> to support a claim of false designation of origin, "[s]uch a claim may be supported . . . by further acts on the part of the infringer falsely representing itself as the owner of the work"); <u>cf</u>. Jerome Gilson, <u>Trademark Protection and Practice</u> § 7.02[5], at 7-26 &

---

Montgomery has stated a claim for false designation of origin. The defendants in <u>Roho</u> escaped liability not because they incorporated the plaintiff's product into their own, but because this incorporation substantially modified both the physical attributes and the purpose of the plaintiff's product. In this case, however, Montgomery created VPIC for the purpose of allowing computer users to view picture files. Without reprogramming VPIC, the defendants incorporated it into their CD-ROM discs for the purpose of allowing users to view the pictures on the discs. Courts have not hesitated to find defendants liable for false designation of origin in such circumstances. <u>See</u>, e.g., <u>F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago</u>, 214 U.S.P.Q. 409, 416-17 (7th Cir. 1982) (finding that defendant who excluded plaintiff's name from custom-made hymnals that incorporated plaintiff's songs and bore the names of defendant's parishes would be liable for false designation of origin if the users of the hymnals were likely to be confused as to the origin of the songs); <u>Sega Enters. Ltd. v. MAPHIA</u>, 948 F. Supp. 923, 938-39 (N.D. Cal. 1996); <u>Playboy Enters., Inc. v. Frena</u>, 839 F. Supp. 1552, 1562 (M.D. Fla. 1993) (defendant who substituted his own advertisement for plaintiff's trademark on certain photographs and incorporated these photographs into his computer bulletin board system held liable for false designation of origin).

28

n.32 (39th rel. 1998) (citing cases for the proposition that the phrase "false designation of origin" includes not only geographic origin but also "origin of source or manufacture").

As to the mistaken affiliation prong, we are not the first court to use this prong in connection with the false designation of origin prong to hold defendants liable for violating section 43(a). Other courts have reached the same result on facts similar to those before us. In Sega Entertainers Ltd. v. MAPHIA, 948 F. Supp. 923 (N.D. Cal. 1996), for example, the defendant used the plaintiff's mark to identify unauthorized copies of plaintiff's video games that the defendant had incorporated into his computer bulletin board system; the plaintiff's mark also appeared when a bulletin board user downloaded and played the counterfeit games. In ruling on the plaintiff's motion for summary judgment, the court found that the defendant had infringed the plaintiff's trademark and violated both the false designation of origin and mistaken affiliation prongs of section 43(a). Id. at 937-39. In particular, the court concluded that the plaintiff had established a likelihood of confusion because "[a]ny member of the public that logged onto [the defendant's bulletin board system] was likely to think that the trademark indicated that the games were sponsored by or affiliated with Sega." Id. at 938 (emphasis added).[28]

---

[28] The court in Sega did not explicitly refer to the "false designation of origin prong" or the "mistaken affiliation prong" in its discussion of section 43(a). Nonetheless, the passage quoted above – which refers both to sponsorship (a part of the false designation of origin prong, see supra note 25) and to mistaken affiliation – appears in the court's analysis of the plaintiff's trademark infringement claim. In its subsequent examination of the plaintiff's claim under section 43(a), the court made the following statement: "For the same reasons set forth regarding Sega's trademark infringement claim, [the defendant's] use of the Sega trademark is likely to be confusing and to cause damage to Sega and, therefore, Sega is entitled to summary judgment regarding [the defendant's] liability under 15 U.S.C. § 1125(a)." Sega, 948 F. Supp. at 939.

29

In light of the above authorities and the well-established principle that section 43(a) should be broadly construed,[29] we conclude that the district court did not err in rejecting the defendants' contention that Montgomery failed to state a claim under section 43(a) as a matter of law. The jury properly was allowed to determine whether users of the defendants' CD-ROM discs were likely to be confused, mistaken, or deceived regarding whether the defendants were the source of VPIC or had a license to use it.

2.

The defendants' two remaining contentions pertain to two of the elements that a plaintiff is required to prove in order to establish a claim for infringement of an unregistered mark under section 43(a) of the Lanham Act, namely: (1) that the plaintiff's mark either is inherently distinctive or has acquired distinctiveness through secondary meaning; and (2) likelihood of confusion. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-69, 112 S. Ct. 2753, 2757-58, 120 L. Ed. 2d 615 (1992); University of Ga. Athletic Ass'n v. Laite, 756 F.2d 1535, 1541 (11th Cir. 1985). The district court rejected the defendants' claim that these elements had not been proven, and the jury found them liable for violating section 43(a). Because it is for the trier of fact to decide whether these elements have been proven, we will not reverse the jury's

---

[29] See, e.g., Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1383 (5th Cir. 1996); Thorn v. Reliance Van Co., 736 F.2d 929, 932 n.5 (3d Cir. 1984) (mentioning "the widely-held view that as a remedial statute, [section 43(a)] should be broadly construed"); F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. 409, 416 (7th Cir. 1982); Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 651 (6th Cir. 1982); Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir. 1981) (noting that "§ 43(a) of the Lanham Act is remedial in nature, and should be interpreted and applied broadly so as to effectuate its remedial purpose").

verdict absent clear error. See Bauer Lamp Co. v. Shaffer, 941 F.2d 1165, 1170 (11th Cir. 1991); Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 839-840 & n.16 (11th Cir. 1983); Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 n.12, 1186 (5th Cir. 1980).[30]

On appeal, the defendants contend that Montgomery could not possibly have met the distinctiveness requirement because he did not use the term "VPIC" as a mark in connection with his computer program.[31] It is true that the closing screen of version 4.3 of his program (which did not appear when users viewed the pictures on the defendants' discs) merely contained the following statement: "Picture file viewer for VGA/EGA ver 4.3 (C) Copyright 1990, 1991 Bob Montgomery, All Rights Reserved . . . ." Other evidence at trial demonstrated, however, that Montgomery distributed an additional computer file with version 4.3; this file, which was entitled "VPIC User's Manual," repeatedly referred to the program as "VPIC." Montgomery testified that the term "VPIC," which stands for "view pictures," was also used to describe his program in various print publications. In fact, Montgomery's program was referred to as "VPIC" when it was included in a 1992 compilation of shareware programs known as the Dvorak Top Thirty. These uses of the term "VPIC" were obviously sufficient to catch the attention of the defendants, who themselves referred to Montgomery's program as "VPIC" in

---

[30] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[31] The defendants do not argue that the term "VPIC," even if used as a mark, is not inherently distinctive and has not acquired distinctiveness through secondary meaning. We therefore need not move beyond the threshold issue of whether that term was used as a mark in order to consider the distinctiveness of the term itself.

their help menu.  Clearly, therefore, the jury had a sufficient evidentiary basis upon which to

conclude that Montgomery used the term "VPIC" as a mark.

The defendants also contend that Montgomery failed to demonstrate a likelihood of

confusion as to whether the defendants either were the source of VPIC or had a commercial

license to use it.  Their first argument in support of this contention is that Montgomery could not

have shown any likelihood of pre-sale confusion[32] by purchasers of the defendants' CD-ROM

discs because the term "VPIC" does not appear on the packaging of any of the discs.  This

argument misapprehends the nature of Montgomery's claim for damages.  Montgomery is not

claiming that the defendants used the term "VPIC" on their packaging in order to persuade

purchasers to buy their disc instead of his program; he is claiming that users of the defendants'

discs would likely be confused about either the source or the license status of VPIC and thus

would be unlikely to pay him the required licensing fee for their individual use of his program in

connection with the defendants' discs.  Such user confusion, if properly proven, is an appropriate

basis for a finding of likelihood of confusion under section 43(a).[33]

_____

[32] In United States v. Torkington, 812 F.2d 1347 (11th Cir. 1987), we recognized that
pre-sale confusion of actual purchasers is not the only type of confusion actionable under the
Lanham Act.  Instead, the likely to confuse test is also satisfied "when potential purchasers of the
trademark holder's products would be likely to be confused should they encounter the allegedly
counterfeit goods in a post-sale context – for example, in a direct purchaser's possession."  Id. at
1352.  In this case, however, neither the pre-sale confusion of actual purchasers nor the post-sale
confusion of potential purchasers is at issue; it is the post-sale confusion of actual purchasers –
that is, the confusion of users of the defendants' discs (most of whom, presumably, previously
had purchased the discs they were using) – that concerns Montgomery.

[33] In each of the three cases cited at the end of note 27, supra, the court recognized that
defendants may be held liable for user confusion.  See F.E.L. Publications, 214 U.S.P.Q. at 416
("By printing its own name on the hymnals and excluding F.E.L.'s, the parishes have used a
false designation of origin if the users of the hymnals are confused as to the origin of the

The defendants also argue, however, that Montgomery did not provide sufficient proof regarding the likelihood of user confusion. They note that Montgomery offered no evidence at trial to indicate that he had been contacted by any confused users who mistakenly thought that he and the defendants were associated. In addition, they point to Montgomery's own statement at trial that users of one of the defendants' CD-ROM titles "never would even know that VPIC was on there."

We observe that Montgomery made this statement as part of a discussion of the process that a user would follow in order to view a picture file on one of the defendants' discs. Montgomery testified that when a user selected a picture file from the defendants' CD menu, the menu would utilize VPIC to display the file. Upon pressing a key, the user would be returned to the CD menu and "never would even know that VPIC was on there." Montgomery also testified, however, that users who did not have one specific brand of video card in their computers would need to visit the defendants' CD help menu before engaging in this viewing process. As noted in part II.C.1., <u>supra</u>, this help menu told users of other video cards how to set up one of two available picture file viewing utilities – VPIC ("the best one to use") or CSHOW – in order to view the picture files that were present on the defendants' discs. It is the references to VPIC that appear in this help menu, along with the defendants' omission of the VPIC copyright notice, that Montgomery relies upon to establish a likelihood of user confusion. After placing

---

songs."); <u>Sega</u>, 948 F. Supp. at 938 (holding that members of the public who used defendant's computer bulletin board system were likely to be confused regarding whether certain games available therein were sponsored by or affiliated with the plaintiff); <u>Playboy</u>, 839 F. Supp. at 1554, 1561-62 (concluding that individuals who subscribed to defendant's computer bulletin board system and subsequently viewed certain images on the system were likely to be confused as to whether plaintiff had sponsored, endorsed, or approved defendant's use of its images).

Montgomery's statement in this context, we conclude that it was not clear error for the jury to find a likelihood of user confusion despite this statement.

With respect to the defendants' argument that no confused users had contacted Montgomery, we have held that a plaintiff is not required to provide evidence of actual confusion in order to prove likelihood of confusion. See Bauer Lamp, 941 F.2d at 1171-72. Instead, actual confusion is merely one of several factors that may be relevant in analyzing whether there is a likelihood of confusion between two marks. See Jellibeans, 716 F.2d at 840 (listing factors); John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 972 (11th Cir. 1983). The defendants do not contend that any of the other factors point to the conclusion that users of their CD-ROM discs were unlikely to be confused. We therefore cannot say, based merely on the absence of evidence of actual confusion, that the jury clearly erred in finding a likelihood of confusion.

D.

The defendants' next claim of error relates to the district court's decision to preclude one of their witnesses from testifying as an expert. At trial, the defendants' counsel attempted to qualify Mr. Bahram Yusefzadeh as an expert witness who would provide testimony about computer software licensing practices, the various types of software licenses available, and the pricing of unlimited use licenses. On voir dire, Montgomery's counsel established that Yusefzadeh's knowledge and experience pertained to the development, marketing, and licensing of commercial software used by individual banks. Yusefzadeh had no experience either in negotiating utility licenses for software that was distributed as "shareware" – such as VPIC – or

34

in marketing software through distributors under a "shrink-wrap" license – the method by which the defendants marketed their four CD-ROM titles. Montgomery's counsel then objected to the admission of expert testimony by Yusefzadeh, and the district court sustained the objection on two grounds. First, the court found that Yusefzadeh was not qualified as an expert because the defendants had not shown that his experience with banking software was germane to the issues involved in the case. Second, the court noted that the meaning of the terms used to describe the various types of software licenses (e.g., single-user, multi-user, and unlimited use) would be self-evident to the jury and thus did not require explanation by an expert.

Our consideration of the district court's ruling is informed by Fed. R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

When recast using the language of Rule 702, the two grounds given by the district court for its ruling essentially were (1) that Yusefzadeh was not "qualified as an expert by . . . experience" to testify to "a fact in issue" in this case; and (2) that his testimony describing the various types of software licenses would not "assist the trier of fact to understand the evidence." The defendants challenge the first of these grounds on appeal. They claim that the basic principles of commercial software licensing also apply to shareware and utility licensing, and therefore

35

contend that Yusefzadeh's commercial licensing experience was germane to the issue of Montgomery's damages.[34]

We review the district court's ruling regarding Yusefzadeh's qualifications under a deferential standard. "A trial court has wide discretion in determining whether to exclude expert testimony, and its action will be sustained unless manifestly erroneous." United States v. Cross, 928 F.2d 1030, 1049 (11th Cir. 1991) (internal quotation marks omitted). We find no indication of manifest error here. After considering the defendants' assertion that Yusefzadeh's experience in the commercial software licensing field was also applicable in the shareware and utility licensing field, the district court concluded that these two fields were "totally distinguishable." Because the defendants present no support for their assertion on appeal, we defer to the district court's conclusion.

E.

Finally, the defendants contend that the district court erred in awarding Montgomery $142,289.26 in attorneys' fees on his copyright and Lanham Act claims. Although the district

---

[34] Specifically, the defendants argue that Yusefzadeh was qualified to provide the following testimony relating to damages: (1) it is not unusual in the computer licensing business for a licensee to negotiate an unlimited use license for a lump sum; and (2) the issuance of a newer and improved version of a computer program renders older versions virtually worthless. These two opinions appeared in the expert witness report prepared by Yusefzadeh and filed by the defendants. See Fed. R. Civ. P. 26(a)(2).

court did not allocate a specific portion of its award to each claim,[35] we review the defendants'

contentions regarding the propriety of a fee award under each claim in turn.


1.

In a civil copyright infringement action, 17 U.S.C. § 505 (1994) empowers the court to

award a "reasonable attorney's fee to the prevailing party." Such fees "are to be awarded . . .

only as a matter of the court's discretion." Fogerty v. Fantasy, Inc., 510 U.S. 517, 534, 114 S.

Ct. 1023, 1033, 127 L. Ed. 2d 455 (1994). Where the record reveals that the district court

weighed the relevant factors[36] and exercised its discretion, as it did here, we will not question the

court's decision to grant or deny fees absent an abuse of that discretion. See Casella v. Morris,

820 F.2d 362, 366-67 (11th Cir. 1987).

The defendants contend that the district court abused its discretion in two ways when it

awarded attorneys' fees to Montgomery on his copyright claim. First, they argue that because

Montgomery's evidence of damages was based on unregistered versions of VPIC, an award of

attorneys' fees was not permitted by 17 U.S.C. § 412 (1994). Section 412 states, in pertinent

---

[35] The defendants requested that the court make such an allocation. While the court deemed this request to be "logical and well-founded," it was unable to make the allocation because Montgomery's attorneys neither divided their billed time between the claims nor indicated whether they had spent substantially more time on one of the claims.

[36] See Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 853-54 (11th Cir. 1990); Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). We note that the jury in this case found that the defendants' infringement was willful. Such a finding of willful infringement, while it "does not compel a fee award, . . . is an 'important factor' in the district court's 'discretionary decisionmaking.'" Cable/Home Communication, 902 F.2d at 854 (quoting Casella, 820 F.2d at 366).

37

part, that "no award . . . of attorney's fees . . . shall be made for . . . any infringement of copyright in [a work] commenced before the effective date of its registration . . . ." We reject this argument for the reasons discussed in parts II.A.2. and II.B., supra.

The defendants' second argument is that because Montgomery had a contingency fee agreement with his attorneys, the district court should not have awarded attorneys' fees based upon the amount of time that Montgomery's attorneys spent on the case. Such an award, in the defendants' view, impermissibly included a premium above the fees actually incurred by Montgomery. While the defendants certainly are correct that an award of attorneys' fees under section 505 should not include an additional amount – in excess of the reasonable value of services rendered – by way of penalty, see 4 Nimmer § 14.10[C], we are convinced that no such amount was awarded here. As the district court recognized, the contingency fee agreement between Montgomery and his attorneys provided that the attorneys were entitled to a certain percentage of any "amount recovered" from the defendants. The term "amount recovered" was defined to include "the total amount awarded by the Court or jury, together with all attorneys' fees awarded by the Court, and shall include that amount of attorneys' fees awarded as a contingency fee multiplier." Clearly, the terms of this agreement did not prevent the district court from awarding Montgomery a reasonable amount in attorneys' fees that was based on the amount of time his attorneys spent on the case. We therefore conclude that the district court did not abuse its discretion by awarding attorneys' fees to Montgomery on his copyright claim.

2.

38

Turning to the issue of fee awards under the Lanham Act, section 35(a) provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (1994). Such an award is available in actions under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), that involve unregistered trademarks. See Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458 (11th Cir. 1984). The jury found that Montgomery's claim under section 43(a) was an "exceptional" case, and the district court exercised its discretion to award him attorneys' fees on that claim.

On appeal, the defendants argue that Montgomery is not entitled to fees because he was not the "prevailing party" on his Lanham Act claim. We have stated in a related context that the prevailing party is "the party succeeding on a significant litigated issue that achieves some of the benefits sought by that party in initiating the suit." Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 853 (11th Cir. 1990) (applying this definition to an award of attorneys' fees in the copyright infringement context). "Where the [party's] success on a legal claim can be characterized as purely technical or de minimis, a district court would be justified in concluding that [this definition] has not been satisfied." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792, 109 S. Ct. 1486, 1493-94, 103 L. Ed. 2d 866 (1989).

The defendants contend that Montgomery's success was de minimis because the jury awarded him only $30 in damages on his Lanham Act claim. Montgomery responds that the jury was instructed not to award him "a double recovery of the same damages" on his copyright and Lanham Act claims. He argues, therefore, that the incremental $30 award is consistent with the conclusion that he prevailed on his Lanham Act claim.

39

We need not focus solely on this damage award, however, in order to determine whether Montgomery is entitled to attorneys' fees. It is also important to note that the district court, at Montgomery's request, permanently enjoined the defendants from producing or transferring CD-ROM discs containing VPIC under the relevant provisions of both the Lanham and Copyright Acts. See 15 U.S.C. § 1116 (1994); 17 U.S.C. § 502 (1994). Montgomery's success in procuring this injunction achieved a significant benefit – namely, preventing the defendants from falsely designating the origin of VPIC – that he sought in initiating this suit. Considering both the damages and injunctive relief that he received on his Lanham Act claim, therefore, we conclude that Montgomery was a "prevailing party" within the meaning of 15 U.S.C. § 1117(a).[37] The district court did not err in awarding him attorneys' fees on his Lanham Act claim.

III.

For the foregoing reasons, the challenged rulings of the district court are AFFIRMED.

---

[37] We express no opinion on the question of whether the incremental $30 damage award alone would be sufficient to make Montgomery a "prevailing party."

40